1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Michael Harrosh,                          No. 2:21-cv-01969-KJM-JDP

12                    Plaintiff,                ORDER

13         v.

14   Tahoe Regional Planning Agency; George and
     Virginia Johannessen,
15

16                    Defendants.

17

18         George and Virginia Johannessen obtained approval to build a new pier on their lot on the

19   west shore of Lake Tahoe.  Their neighbor to the south, Michael Harrosh, challenges that

20   approval in this action, which he filed against the Johannessens and the agency charged with the

21   approval decision, the Tahoe Regional Planning Agency.  The Agency has moved to dismiss.  As

22   explained in this order, **that motion is denied**.  At this early stage of the case, the court cannot

23   conclude the approval was proper.

24         Harrosh now also moves for a preliminary injunction barring construction of a pier while

25   this case is pending.  He has not shown he will suffer irreparable harm in the absence of an

26   injunction, a prerequisite to injunctive relief.  His motion is therefore also **denied**, as explained in

27   this order.

                                          1

## I.   BACKGROUND

Lake Tahoe is famous for its beauty, striking blue color, and exceptional clarity.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 307 (2002).  "It first caught the world's attention with the 1960 Winter Olympics . . . , when the area became a recreation destination and home to a rapidly expanding population."  *Sierra Club v. Tahoe Reg'l Plan. Agency*, 840 F.3d 1106, 1108 (9th Cir. 2016).  "It has since become the focus not only of admiration for the lake's beauty and clarity, but of litigation over the efforts to preserve them."  *Id.*

Since the 1950s and '60s, greater development in the Lake Tahoe basin has increased runoff and mineral deposits into the lake.  *Tahoe-Sierra*, 535 U.S. at 307.  As a result, more algae has begun to grow in the lake's waters, which have lost their original hue and clarity.  *See id.* at 307–08; *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 739 F. Supp. 2d 1260, 1265 (E.D. Cal. 2010).[1]  To address this problem and other concerns, the California and Nevada state legislatures adopted the Tahoe Regional Planning Compact, which Congress approved in the late 1960s.  *See Tahoe-Sierra*, 535 U.S. at 309; *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 507 F.2d 517, 518 (9th Cir. 1974) (citing U.S. Const. Art. I, § 10, cl. 3).

The Compact is federal law for purposes of a federal court's subject matter jurisdiction.  *See League to Save Lake Tahoe*, 507 F.2d at 524–25; *Lake Tahoe Watercraft Recreation Ass'n v. Tahoe Reg'l Plan. Agency*, 24 F. Supp. 2d 1062, 1067–69 (E.D. Cal. 1998).  It creates the Tahoe Regional Planning Agency, which adopted a series of regulations.  *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1070 (9th Cir. 2003).  "Unfortunately," those regulations "allowed numerous exceptions and did not significantly limit the construction of new residential housing."  *Tahoe-Sierra*, 535 U.S. at 309.  "California became so dissatisfied" with the Agency and its regulations that it "withdrew its financial support and unilaterally imposed stricter regulations on the part of the Basin located in California."  *Id.*

---

[1] The Ninth Circuit affirmed all relevant portions of this decision in a short, unpublished memorandum disposition.  *See* 469 F. App'x 621 (9th Cir. 2012) (unpublished).  It vacated an "alternative holding" that is not relevant for the court's present purposes.  *See id.* at 621.

California and Nevada later amended the Compact and "redefined" the Agency's "structure, functions, and voting procedures," and Congress approved these amendments in 1980. *Tahoe-Sierra*, 535 U.S. at 310.  The amended Compact requires the Agency to create "environmental threshold carrying capacities," that is, environmental standards "necessary to maintain a significant scenic, recreational, educational scientific, or natural value of the region or to maintain public health and safety within the region." *League to Save Lake Tahoe*, 739 F. Supp. 2d at 1265 (quoting Compact Arts. I(b), II(i), ECF No. 32).[2]  The amended Compact tasks the Agency with regulating the Lake Tahoe Basin to achieve these thresholds, both by adopting and administering general ordinances, rules and regulations, *see, e.g.*, Compact Art. I(b), and by making decisions about specific projects, *see, e.g.*, *id.* Art. V(g).

This case concerns the second category: specific projects.  The Compact defines "project" as "an activity undertaken by any person, including any public agency, if the activity may substantially affect the land, water, air, space or any other natural resources of the region." *Id.* Art. II(h); *see also* Code of Ordinances §§ 2.1.2, 2.2.1, ECF No. 16-2.[3]  The Compact creates a unique supermajority voting procedure for "approving a project." Compact Art. III(g)(2).  The Agency's Governing Board conducts the vote. *Id.* That body is composed of two delegations of seven voting members each. *See id.* Art. III(a).  The members of the first delegation, the "California delegation," are appointed by the El Dorado and Placer county boards of supervisors, the South Lake Tahoe City Council, the Governor of California, the speaker of the California Assembly, and the California Senate Rules Committee. *See id.* Art. III(a)(1).  Second, the members of the "Nevada delegation" are appointed by the boards of the Douglas and Washoe county commissioners, the Carson City Board of Supervisors, the Governor of Nevada, the Nevada Secretary of State, and the director of the state's department of conservation and national resources. *See id.* Art. III(a)(2).  Before a project is approved, under subjection (g)(2) of Article III, "the affirmative vote of at least five members from the State in which the project is located

---

[2] The court grants the Agency's unopposed request for judicial notice of this document's terms.  Those terms are publicly available and cannot reasonably be disputed. *See* Fed. R. Evid. 201(b).

[3] *See supra* note 2.

1    and the affirmative vote of at least nine members of the governing body are required." *Id.*  If the

2    Governing Board votes to approve a project, its decision must "be supported by a statement of

3    findings, adopted by the agency." *Id.*  If a project does not garner the necessary votes, "upon a

4    motion of approval, an action of rejection shall be deemed to have been taken." *Id.*

5         The "project" at the center of this case is the Johannessens' proposal to construct a single-

6    parcel residential pier on their lot.  *See* Compl. ¶¶ 5–7, ECF No. 1.  According to the complaint,

7    which for purposes of a motion to dismiss the court accepts as true, *Ashcroft v. Iqbal*, 556 U.S.

8    662, 678 (2009), the demand for single-parcel residential piers far outstrips available permits, so

9    the Agency holds a lottery in which the winners may apply for a pier permit.  *See id.* ¶¶ 24, 30;

10   Code of Ordinances § 84.4.4(C)(1).  In the summer of 2019, the Johannessens won a chance to

11   apply for a permit.  Compl. ¶ 40.  They submitted their plan to the Agency about six months later.

12   *Id.* ¶ 41.  Harrosh owns land just to the south of the Johannessens.  *Id.* ¶¶ 5, 11.  His property

13   already has a pier.  *Id.* ¶¶ 5–6.  He claims that if the Johannessens' planned pier is constructed, it

14   would be difficult and dangerous to approach his own pier from the water.  *See id.* ¶ 7.

15        The Johannessens' application was referred to the hearings officer, who held a meeting in

16   late Spring 2021.  *See id.* ¶ 50.  Harrosh presented evidence in opposition to the Johannessens'

17   application, *id.* ¶ 68, but the hearings officer approved the application and issued a permit, *id.*

18   ¶¶ 70–75.  Harrosh pursued an appeal to the Governing Board.  *See id.* ¶ 79.  The Agency's

19   general counsel advised the Board during the appeal.  *See id.* ¶ 87.  He told the Board the first

20   step was to decide whether it would "accept" or "reject" the appeal, then to decide whether to

21   modify or reject the permit.  *Id.*  He said that if at least five members of the California delegation

22   and at least nine members overall voted "aye," then the Board would "accept" the appeal and

23   could either modify or reject the hearings officer's decision.  *Id.* ¶¶ 87–88.  Otherwise, counsel

24   explained, the Board would "reject" the appeal, the hearings officer's decision would stand, and

25   the Agency would issue a permit to the Johannessens.  *See id.* ¶ 88.  Counsel recommended

26   rejecting the appeal.  *Id.* ¶ 86.

27        There were two vacancies among the seven-member California delegation at the time.  *Id.*

28   ¶ 81.  As a result, given counsel's instructions, if even a single member of the California

4

1    delegation did not vote "aye," then the Governing Board would reject the appeal.  This appeared

2    to doom Harrosh's appeal from the outset: one member of the California delegation,  Cindy

3    Gustafson, told the Board at the beginning of the meeting that she had a "long-standing social

4    relationship with the Harrosh family," she had visited their home and pier for social events, and

5    she had discussed the appeal with the Harrosh family before the hearing.  *Id.* ¶ 85.  If she voted

6    for Harrosh, then any decision to accept the appeal and reject the permit could be subject to attack

7    based on the appearance of her partiality.  If she voted for the Johannessens, the appeal would

8    necessarily be rejected.  The result would be the same if she abstained.

9         The Governing Board heard evidence, the parties' arguments, and public comments, and

10   board members made comments.  *Id.* ¶¶ 89–90.  Board members then voted.  Ms. Gustafson

11   abstained, and all other board members voted "no."  *See id.* ¶¶ 92–97.  The Board thus rejected

12   the appeal by default.

13        Harrosh filed this action after the vote, asserting four claims.  His first claim can be

14   expressed in a variety of ways, but it boils down to a simple theory: the Governing Board's vote

15   was invalid because the Compact requires at least five "affirmative" votes from the California

16   delegation to approve a permit, but only four members of the California delegation voted to reject

17   his appeal.  *See id.* ¶¶ 108–20.  In his second claim, he alleges the Agency misinterpreted its Code

18   of Ordinances, which imposes specific limits on pier lengths.  *See id.* ¶¶ 121–37.  Third, he

19   alleges the Agency was wrong to conclude the Johannessens' pier would not be a threat to public

20   safety.  *See id.* ¶¶ 138–51.  Fourth, he alleges the hearing and appeal procedure violated his Fifth

21   Amendment right to due process.  *See id.* ¶¶ 152–68.  He seeks declaratory judgment, an

22   injunction, nominal damages, fees, costs, and any other relief the court deems just and proper

23   under the circumstances.  *Id.* at 25–26.

24        The Agency moves to dismiss the first and fourth claims, but not the second and third.

25   *See generally* Mot. Dismiss, ECF No. 14; Mem. Dismiss, ECF No. 15.  The matter has been fully

26   briefed.  *See generally* Opp'n Dismiss, ECF No. 23; Reply Dismiss, ECF No. 25.  The

27   Johannessens joined the Agency's reply brief, but not its motion.  *See generally* Joinder, ECF No.

28   26.  The court heard oral argument at a hearing earlier this year, on March 25, 2022, and

1    submitted the matter for decision.  Peter Prows and Anthony Francois appeared for Harrosh.

2    Debbie Leonard and John Marshall appeared for the Tahoe Regional Planning Agency.  Kristen

3    Castanos and Lauren Neuhaus appeared for the Johannessens.

4         Before hearing, the parties stipulated to dismissal of Harrosh's fourth claim under Federal

5    Rule of Civil Procedure 41(a)(1)(A)(ii).  *See* Stip., ECF No. 28.  The Ninth Circuit has held

6    litigants may not dismiss claims piecemeal by stipulation under Rule 41(a)(1), as that rule refers

7    to "actions," not claims.  *See Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683,

8    687–89 (9th Cir. 2005).  A district court may, however, construe such a stipulation as an

9    unopposed request to amend the complaint and withdraw the claim in question under Rule 15(a).

10   *See id.* at 688–89.  The court construes the stipulation in this way and grants the request to amend

11   under Rule 15(a).  The motion to dismiss, then, challenges only the first claim.

12        After hearing and while the motion to dismiss was pending, the Johannessens obtained

13   other necessary permits for the proposed pier, including from the U.S. Army Corps of Engineers

14   and the California State Lands Commission.  *See* Req. J. Not. ¶¶ 2–4 & Exs. 2–4, ECF No. 36-1.[4]

15   They began construction in October 2022.  S. Harrosh Decl. ¶ 3, ECF No. 34-2.  Harrosh then

16   sought a temporary restraining order.  *See generally* App. TRO, ECF No. 34.  The court

17   temporarily restrained the pier's construction until it could hold a hearing on a preliminary

18   injunction in light of the potential environmental harms.  *See generally* TRO, ECF No. 35.  The

19   court held the hearing on November 8, 2022 after receiving responses from the defendants.  *See*

20   Johannessen Resp., ECF No. 36; TRPA Resp., ECF No. 37.[5]  At this hearing, Anthony Francois

21   and Peter Prows appeared for the plaintiff, John Marshall appeared for the Agency, and Kristen

22   Castanos, Gregory Gatto, and Michael Mills appeared for the Johannessens.

23        After hearing, the court dissolved the temporary restraining order and denied the motion

24   for a preliminary injunction by minute order, specifying that a "written order fully explaining the

---

[4] The court takes judicial notice of these documents as undisputed matters of public record.  *See* Fed. R. Civ. P. 201(b).

[5] Harrosh objected to some of the evidence submitted with the Johannessens' response. *See* Objs., ECF Nos. 38, 44.  The court has not relied on any of the evidence in question; Harrosh's objections are overruled as moot.

court's decision will soon issue." ECF No. 40.  Later that day, Harrosh filed a motion for an

injunction pending appeal, ECF No. 42, which the court also denied by minute order, again

stating that a written order more fully explaining the court's decision would soon issue, ECF

No. 46.  This order explains the court's decision on the request for a preliminary injunction and

addresses the motion for injunction pending appeal.

## II.   MOTION TO DISMISS

A party may move to dismiss for "failure to state a claim upon which relief can be

granted." Fed. R. Civ. P. 12(b)(6).  The motion may be granted if the complaint lacks a

"cognizable legal theory" or if its factual allegations do not support a cognizable legal theory.

*Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1208 (9th Cir. 2019) (quoting *Balistreri v.*

*Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988)).  The court assumes all factual

allegations are true and construes "them in the light most favorable to the nonmoving party."

*Steinle v. City & Cnty. of San Francisco*, 919 F.3d 1154, 1160 (9th Cir. 2019) (quoting *Parks Sch.*

*of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995)).  If the complaint's allegations do

not "plausibly give rise to an entitlement to relief," the motion must be granted.  *Ashcroft v. Iqbal*,

556 U.S. 662, 679 (2009).

The Agency advances three arguments for dismissal.  First, it argues Harrosh's first claim

is barred because he did not first raise it during the agency proceedings.  Second, it argues the

claim was filed after the limitations period had expired.  Third, it contends its interpretation of the

Compact's voting procedures is reasonable, entitled to deference, and valid.  The court considers

each of these arguments in turn.

### A.   Did Harrosh exhaust his claim that the Governing Board's vote is invalid?

"It is a well-known axiom of administrative law that 'if a petitioner wishes to preserve an

issue for appeal, he must first raise it in the proper administrative forum.'" *Barron v. Ashcroft*,

358 F.3d 674, 677 (9th Cir. 2004) (quoting *Tajeda-Mata v. I.N.S.*, 626 F.2d 721, 726 (9th Cir.

1980)).[6]  Congress has often imposed this rule by statute.  *United States v. L. A. Tucker Truck*

---

[6] "Issue exhaustion should not be confused with exhaustion of administrative remedies." *Carr v. Saul*, 141 S. Ct. 1352, 1358 n.2 (2021).  There is no dispute that Harrosh proceeded

1  *Lines, Inc.*, 344 U.S. 33, 36–37 & n.6 (1952); *see also Sims v. Apfel*, 530 U.S. 103, 107–08 (2000)

2  (listing examples).  "Similarly, it is common for an agency's regulations to require issue

3  exhaustion in administrative appeals," and when they do, "courts reviewing agency action

4  regularly ensure against the bypassing of that requirement by refusing to consider unexhausted

5  issues."  *Sims*, 530 U.S. at 108.

6      The Supreme Court also has "imposed an issue-exhaustion requirement even in the

7  absence of a statute or regulation."  *Id.*  The judge-made exhaustion rule serves several interests.

8  One is "[s]imple fairness to those who are engaged in the tasks of administration, and to

9  litigants."  *L. A. Tucker Truck Lines*, 344 U.S. at 36–37.  "[C]ourts should not topple over

10  administrative decisions unless the administrative body not only has erred but has erred against

11  objection made at the time appropriate under its practice."  *Id.*  The exhaustion rule also permits

12  agencies to correct their own errors.  *Weinberger v. Salfi*, 422 U.S. 749, 765 (1975).  Just as

13  litigants in a trial court should "have the opportunity to offer all the evidence they believe

14  relevant" before an appellate court ultimately weighs in, and just as those same parties have an

15  interest in avoiding surprises on appeal, so, too, the participants in an administrative process have

16  an interest in a complete and final administrative procedure.  *Hormel v. Helvering*, 312 U.S. 552,

17  556 (1941).

18      In addition, agencies often have technical expertise, and Congress may have granted an

19  agency the authority to exercise discretion.  If litigants could raise arguments for the first time in

20  a judicial complaint, they might deprive both the court of the agency's expertise and the agency

21  of its discretionary powers.  *See McKart v. United States*, 395 U.S. 185, 194 (1969).  But even

22  when a dispute falls within a court's traditional area of expertise, such as interpreting a statute,

23  the exhaustion rule may serve an important purpose.  A court may ultimately need to consider the

24  agency's interpretation of its governing statute.  *See Chevron, U.S.A., Inc. v. Nat. Res. Def.*

25  *Council, Inc.*, 467 U.S. 837, 844 (1984); *California ex rel. Van de Kamp v. Tahoe Reg'l Plan.*

26  *Agency*, 766 F.2d 1308, 1313 (9th Cir. 1985).  The exhaustion rule helps to "ensure that

---

through each step of the hearing and review process laid out in the Compact and the Agency's
regulations before he filed this action; he has thus exhausted his administrative remedies.

1   challenges to an agency's interpretation of its governing statute are first raised in the

2   administrative forum." *Nuclear Energy Institute, Inc. v. Env't Prot. Agency*, 373 F.3d 1251,

3   1298 (D.C. Cir. 2004) (quoting *Nat. Res. Def. Council v. EPA*, 25 F.3d 1063, 1074 (D.C. Cir.

4   1994)).

5         Courts do not enforce this exhaustion rule reflexively.  It "should be applied with a regard

6   for the particular administrative scheme at issue." *Weinberger*, 422 U.S. at 765.  "[L]ike most

7   judicial doctrines," it is also "subject to numerous exceptions." *McKart*, 395 U.S. at 193.  For

8   example, a court "may decide an issue not raised in an agency action if the agency lacked either

9   the power or the jurisdiction to decide it." *Reid v. Engen*, 765 F.2d 1457, 1460–61 (9th Cir.

10  1985).  "This situation is typified by challenges to the constitutionality of a statute or challenges

11  to the constitutionality of a regulation promulgated by the agency." *Id.* at 1461 (citations

12  omitted).  The Supreme Court "has often observed that agency adjudications are generally ill

13  suited to address structural constitutional challenges, which usually fall outside the adjudicators'

14  areas of technical expertise." *Carr*, 141 S. Ct. at 1360.  The Court has also "consistently

15  recognized a futility exception to exhaustion requirements." *Id.* at 1361 (collecting authority).  "It

16  makes little sense to require litigants to present claims to adjudicators who are powerless to grant

17  the relief requested." *Id.*  The Supreme Court has boiled the question down to a comparison test.

18  In the absence of a statute or regulation, a court asks whether the administrative proceeding in

19  question is "adversarial" or "inquisitorial." *See Carr*, 141 S. Ct. at 1358–59.  When "the parties

20  are expected to develop the issues in an adversarial administrative proceeding, . . . the rationale

21  for requiring issue exhaustion is at its greatest." *Sims*, 530 U.S. at 110.  By contrast, if "an

22  administrative proceeding is not adversarial, . . . the reasons for a court to require issue

23  exhaustion are much weaker." *Id.*

24        The statutory law that governs this case—the Tahoe Regional Planning Compact—does

25  not demand that a person raise an issue in an administrative procedure before filing a judicial

26  complaint.  It simply permits judicial complaints and defines the standard of review. *See*

27  Compact Art. VI(j).  The Agency does not argue otherwise. *See* Mem. Dismiss at 10–11; Reply

1   Dismiss at 7–9.  As it confirmed at hearing, it relies instead on its regulations.  A few more details

2   about those regulations put the parties' dispute in context.

3        Under the Agency's Code of Ordinances, some "projects" must be approved by the

4   Governing Board in the first instance.  *See* Code of Ordinances § 2.2.2.  This is true, for example,

5   of tour boat operations and airport expansions.  *See id.* § 2.2.2(D)(1)(b), (F)(1)(a).  For other

6   projects, such as short recreational trails and smaller commercial projects, the Governing Board

7   has delegated the initial decision to the Agency's staff, subject to an appeal.  *See, e.g.*, *id.*

8   § 2.2.2(E)(2)(a), (G)(1), (G)(3).  The Agency has tasked a "hearings officer" with making

9   decisions about project applications.  *See* Rules of Procedure Art. 14, ECF No. 16-3.[7]  The

10  hearings officer reviews projects in public hearings after giving advance notice to affected

11  property owners.  *Id.* §§ 14.1, 14.3, 14.4.  The hearings officer can approve or disapprove the

12  project, continue the hearing, or refer the decision to the Governing Board.  *Id.* § 14.2.

13       After the hearings officer makes a decision, the project's proponent, any affected property

14  owners, or anyone who participated as a party may appeal the hearings officer's decision to the

15  Board.  *See id.* § 14.6.  If the hearings officer denied the project, the board reviews "de novo . . .

16  subject to the same procedure and vote requirements that would apply had the project or matter

17  originally been reviewed by the Board."  *Id.* § 11.5.  If, on the other hand, the hearings officer

18  approved the project, the board can decline to hear the appeal by the vote of any eight members.

19  *See id.* § 11.6.1.  If the Board hears the appeal, "it may take action to modify or revoke the

20  approval by the same affirmative vote as would have been required to approve the matter before

21  the Board."  *Id.* § 11.6.2.  "Failure to take such action shall be deemed a denial of the appeal."  *Id.*

22  Then, as noted above, the Compact permits any "aggrieved" party to challenge the Board's

23  decision "in an appropriate court of the States of California or Nevada or of the United States."

24  Compact Art. VI(j)(3).

25       The Agency's rules of procedure impose only one exhaustion requirement over the course

26  of these proceedings.  Any appeal from a hearings officer's decision must include a "written

27  statement of appeal."  Rules of Procedure § 11.2.  "The written statement of appeal shall include

---

[7] *See supra* note 2.

1    the name and address of the appellant and a detailed and specific explanation of the ground for

2    the appeal." *Id.* § 11.4  "Arguments and bases for appeals that are not included in the statement

3    of appeal or staff's position paper shall neither be raised nor considered by the Board."  *Id.*

4              Harrosh does not say in his complaint whether he challenged the Board's voting procedure

5    in his statement of appeal.  The Agency requests judicial notice of a document it claims is

6    Harrosh's publicly filed statement of appeal, *see* Req. J. Not. Ex. 12, ECF No. 16-12, and Harrosh

7    does not oppose that request or contest the document's authenticity.  The court thus grants the

8    Agency's request for judicial notice and considers that document without converting the motion

9    into a motion for summary judgment.  *See, e.g.*, *United States v. 14.02 Acres of Land More or*

10   *Less in Fresno Cty.*, 547 F.3d 943, 955 (9th Cir. 2008); *see also, e.g.*, *Smith v. L.A. Unified Sch.*

11   *Dist.*, 830 F.3d 843, 851 n.10 (9th Cir. 2016) ("[C]ourts routinely take judicial notice of . . .

12   records and reports of administrative bodies." (citation and quotation marks omitted)).

13             Upon review, then, the statement of appeal does not include arguments about the Board's

14   voting procedure, but that omission is not fatal.  The Agency's procedural rules required Harrosh

15   to describe the grounds for his appeal of the hearings officer's decision, and he did that.  *See*

16   *generally* Req. J. Not. Ex. 12 (asserting hearings officer erred procedurally and relied on incorrect

17   findings).  The omitted challenge—that the Board's vote was invalid under the Compact—is not a

18   challenge to the hearings officer's decision; it targets the Board's vote.  Harrosh could not have

19   challenged the Board's vote before that vote occurred, so the agency's procedural rules do not

20   impose an exhaustion requirement that applies to the complaint's first claim.

21             The Agency characterizes that first claim broadly in an attempt to convert it into a

22   challenge that Harrosh could and should have raised in his statement of appeal.  It argues, for

23   example, that when he appeared "before the Hearings Officer, [he] did not dispute the Governing

24   Board's ability to delegate authority to the Hearings Officer to issue a pier permit."  Mem.

25   Dismiss at 10.  But the complaint does not broadly challenge the Agency's delegation of authority

26   to a hearings officer.  Harrosh concedes the Board may delegate authority to a hearings officer,

27   and he admits the appeals procedure does not necessarily violate the Compact.  Opp'n Dismiss at

28   18 n.5.  For example, at hearing, his counsel suggested it may be possible under the Compact for

1    the Board to delegate authority to a hearings officer to make findings and recommendations, then
2    hold a vote using an abbreviated procedure, such as a consent calendar, if no party objects or
3    appeals.

4         Some allegations in the complaint do suggest, however, that Harrosh is contesting the
5    Agency's regulations generally.  He claims, for example, that the regulations violate the Compact
6    "by allowing the approval of projects without an affirmative vote of five members of the Board
7    from the state in which the project is to take place."  Compl. ¶ 111.  Similarly, he claims the
8    regulations wrongly require "a non-applicant appellant from a project approval of the Hearings
9    Officer to obtain five state-specific votes in favor of the appeal, instead of requiring the applicant
10   to obtain five state-specific votes in favor of the application."  *Id.* ¶ 113.  Theoretically, Harrosh
11   could have raised these challenges before the final hearing and vote in his statement of appeal.  If
12   he did, however, he would have been forced to raise the issue by guessing what might happen: if
13   the Board required Harrosh to secure five affirmative votes, if he failed to secure those
14   affirmative votes, if the Board ultimately upheld the hearings officer's decision and issued a
15   permit, and if the disputed voting procedure caused the outcome to change, then the vote would
16   violate the Compact.  Nothing in the Agency's Code of Procedure suggests a person must raise
17   such a conjectural and contingent claim in its statement of appeal.

18        For these reasons, the court concludes Harrosh did not fall short of any statutory or
19   regulatory exhaustion requirement.  If there is an exhaustion requirement, then it must arise under
20   the more general, judge-made rule.  As noted above, whether to impose that requirement is a
21   question of comparison: if the agency proceedings are analogous to the adversarial fact-finding
22   process of trial-court litigation, then "the rationale for requiring issue exhaustion is at its
23   greatest."  *Sims*, 530 U.S. at 110.  The parties have not addressed this question, and the court
24   declines to answer it conclusively at this early stage.  For now, it is enough to note five
25   considerations that weigh against the Agency, which bears the burden "to demonstrate that the
26   requirements of Rule 8(a)(2) have not been met."  *Gallardo v. DiCarlo*, 203 F. Supp. 2d 1160,
27   1165 (C.D. Cal. 2002).

1    First, as explained above, imposing a strict issue-exhaustion requirement in this case

2    would demand the exhaustion of a hypothetical argument about how the board might eventually

3    vote.  The court declines to demand at this point that every contingency be raised and every

4    theory tested in the Agency's appeals process.

5    Second, nothing in the Compact or the Agency's regulations suggests a hearings officer

6    has authority to invalidate regulations or relieve Harrosh from compliance with those regulations.

7    If Harrosh had pressed a broad delegation claim in the meeting with the hearings officer, then

8    there were only two possibilities: (1) the hearings officer could decide the Agency's regulations

9    constrained him and reject the argument out of hand, or (2) the hearings officer could have

10    referred the argument to the full Board.  In neither scenario would the hearings officer have added

11    any useful fact-finding or analysis to the record, and the Board would have confronted Harrosh's

12    claims about the voting procedure in the first instance, just as he alleges it eventually did.  *See*

13    Compl. ¶ 89.

14    Third, similarly, it is unclear whether the Agency could have granted Harrosh the relief he

15    requested.  If Harrosh is correct that the Agency's appeals process violates the Compact in

16    situations like this one, then the Agency would presumably need to amend its regulations or make

17    an ad hoc exception.  Whether it had the power to do so in the hearing on Harrosh's appeal is a

18    question neither party has addressed.  If it did not have this power, it would have been futile for

19    Harrosh to raise the issue before the vote.

20    Fourth, the heart of Harrosh's first claim is a question of statutory interpretation.  The

21    Agency's interpretations of the Compact might be entitled to deference, but not if the relevant

22    statutory is unambiguous.  *See Van de Kamp*, 766 F.2d at 1313 (citing *Chevron* 467 U.S. 837).

23    Deciding what a statute means and whether it is ambiguous "does not require any particular

24    expertise on the part of the [Agency]; the proper interpretation is certainly not a matter of

25    discretion."  *McKart*, 395 U.S. at 198.  "The judiciary is the final authority on issues of statutory

26    construction and must reject administrative constructions which are contrary to clear

27    congressional intent."  *Chevron*, 467 U.S. at 843 n.9.

Finally, Harrosh alleges he did in fact raise the core of his first claim during his administrative appeal.  He alleges he "appeared through counsel and personally at the August 25 appeal hearing" and "raised objections . . . to the voting procedure being used in the appeal." Compl. ¶ 89.  The court must assume this allegation is true at this stage.  The agency had a fair opportunity to consider his arguments.  The court will not dismiss the first claim for failure to exhaust.

### B.      Did Harrosh pursue his claim before the limitations period expired?

Under the Compact, any "legal action arising . . . out of the granting or denial of any permit" must begin "within 60 days after the final action by the agency."  Compact Art. VI(j)(4). The parties disagree what the "final action" was in this case.  Harrosh argues it was the Governing Board's decision to reject his appeal.  *See* Compl. ¶ 109.  The Board made its decision on August 25, 2021, and he filed this action on October 22, 2021, less than sixty days later.  *See id*.  The Agency argues the "final action" was its decision as a matter of policy to delegate permit approvals to a hearings officer, which it made many years ago.  *See* Mem. Dismiss at 9.  If it is right, then the first claim is untimely.

Both Harrosh and the Agency rely on cases interpreting the Administrative Procedure Act (APA).  *See* Opp'n Dismiss at 11 (citing *Cal. Sea Urchin Comm'n v. Bean*, 828 F.3d 1046 (9th Cir. 2016)); Reply Dismiss at 7 (citing, among other authorities, *Shiny Rock Mining Corp. v. United States*, 906 F.2d 1362 (9th Cir. 1990)).  The analogy is useful.  Like the Compact, the APA includes a limitation period tied to the date of "final agency action."  *See, e.g.*, *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citing 5 U.S.C. § 704).  As the Agency does in this case, defendants in cases brought under the APA have moved to dismiss based on an argument that the "final agency action" in question occurred many years before, i.e., when the agency adopted the rule or regulation behind the plaintiff's lawsuit.  *See, e.g.*, *Cal. Sea Urchin Comm'n*, 828 F.3d at 1049.

Two basic accrual rules have emerged in similar cases interpreting the APA.  First, if a plaintiff challenges the policy behind an agency rule or regulation or the process the agency used to adopt that rule or regulation, the "final agency action" is the adoption of those rules or

1   regulations.  *See Wind River Min. Corp. v. United States*, 946 F.2d 710, 715 (9th Cir. 1991);

2   *Shiny Rock*, 906 F.2d at 1365; *Sierra Club v. Penfold*, 857 F.2d 1307, 1315–16 (9th Cir. 1988).  A

3   plaintiff cannot extend the limitations period artificially by arguing the "final agency action" is

4   actually the agency's application or enforcement of the rule or regulation in question.

5            For example, in *Shiny Rock*, the Bureau of Land Management (BLM) had withdrawn an

6   area of federal land from appropriation under U.S. mining laws and given notice of its decision in

7   the Federal Register.  *See* 906 F.2d at 1363.  Many years later, the BLM denied a mining

8   company's application for a mineral patent related to the withdrawn land.  *See id.*  The mining

9   company sued, arguing the BLM had made procedural errors when it made its decision many

10  years before.  *See id.*  The BLM argued the clock had started ticking on the day the notice was

11  published in the Federal Register.  *See id.* at 1364.  The court agreed.  *See id.* at 1364–66.  The

12  Federal Register put potential challengers on notice, and it did not matter that the mining

13  company did not suffer any injury until its application was denied.  *See id.*  Any other rule "would

14  virtually nullify the statute of limitations for challenges to agency orders" by allowing the original

15  rule to be challenged with every permit denial.  *Id.* at 1365.

16           A different rule applies to claims that an agency exceeded its constitutional or statutory

17  authority.  *See Wind River*, 946 F.2d at 715.  For these challenges, the "final agency action" can

18  occur later.  *See id.*  "The government should not be permitted to avoid all challenges to its

19  actions, even if *ultra vires*, simply because the agency took the action long before anyone

20  discovered the true state of affairs."  *Id.* at 715.  "The statute of limitations would cease to be a

21  shield against stale claims, and would instead become a sword to vanquish a challenge . . .

22  without ever considering the merits."  *Cal. Sea Urchin Comm'n*, 828 F.3d at 1051.

23           The *Wind River* decision adopting this rule illustrates its rationale and application.  In the

24  case, another mining company challenged a BLM mining permit decision.  *See* 946 F.2d at 711.

25  As in *Shiny Rock*, the permit decision was based on a years-old notice designating the land in

26  question a federal "wilderness study area."  *See id.*  By federal law, however, an area could be a

27  wilderness study area only if it contained no roads, among other criteria.  *See id.*  The mining

28  company alleged the agency had acted outside its authority because the land in question was not

15

1  actually roadless, and it alleged the designation represented an unconstitutional taking.  *See id.* at

2  712.  "[N]o one was likely to have discovered that the [original designation] was beyond the

3  agency's authority until someone actually took an interest in that particular piece of property,

4  which only happened when [the plaintiff] staked its mining claims."  *Wind River*, 946 F.2d at 715.

5  The Ninth Circuit held the mining company's complaint had been filed within the limitations

6  period.  *See id.* at 715–16.

7      The Ninth Circuit's decision in *California Sea Urchin Commission* illustrates another

8  motivation for this second rule: some challenges are too abstract or too theoretical for meaningful

9  litigation until much later.  In 1986, Congress authorized the U.S. Fish and Wildlife Service to

10  develop and implement a plan to relocate and manage a population of California sea otters.  *See*

11  828 F.3d at 1047.  The Fish and Wildlife Service developed a plan, but its plan included several

12  criteria that might lead to the plan's termination.  *See id.* at 1048.  In 2012, the Fish and Wildlife

13  Service terminated the program, applying these criteria.  *See id.*  A number of commercial fishing

14  groups then filed a lawsuit alleging the rule was outside the agency's statutory authority:

15  Congress had authorized the agency to develop and implement a plan, but not to terminate the

16  plan.  *See id.*  The agency argued the challenge had come too late, but the Circuit disagreed, citing

17  *Wind River* and distinguishing *Shiny Rock*.  *See id.* at 1049–52.  "If parties had to challenge the

18  . . . termination criteria within six years of 1987, then any such challenge predating the program's

19  termination would necessarily have been theoretical."  *Id.* at 1052.  "A plaintiff cannot be

20  expected to anticipate all possible future challenges to a rule and bring them within six years of

21  the rule's promulgation, before a later agency action applying the earlier rule leads to an injury."

22  *Id.* at 1049–50.

23      Turning back to this case, Harrosh is not challenging the procedure the Agency used when

24  it adopted its rules of procedure or its appellate process.  Nor does he contest the policy behind

25  those rules.  This case is therefore unlike *Shiny Rock*.  He argues instead that the Agency has

26  created a voting procedure in conflict with the Compact.  His claims are thus analogous to the

27  statutory and constitutional claims at issue in *Wind River* and *California Sea Urchin Commission*.

28  If the Agency has in fact acted outside its statutory authority, it should not be permitted to

1  continue simply because it has erred for many years.  It was unlikely anyone would discover a

2  potential problem until just the right case, or just the wrong case, finally wound its way to a

3  Board vote, i.e., an appeal by a third party challenging a permit approval by a hearings officer

4  decided by a single abstention.  If someone had discovered this potential problem, it would have

5  been theoretical before now.  The "final action" for purposes of the Compact's limitations period

6  in this case was thus the Board's decision to reject Harrosh's appeal.  His complaint was timely.

7       **C.    Has Harrosh stated a claim for relief based on the Board's vote?**

8       What remains, then, is the core of Harrosh's claim.  Did the Governing Board's vote

9  conflict with the Compact?  The court begins by reviewing the rules for interpreting the

10 Compact's terms and the Agency's regulations.

11      The Compact permits courts to hear "[a]ctions arising out of the issuance to a person of a

12 lease, permit, license or other entitlement for use by the agency."  Compact Art. VI(j)(1)(B).

13 When a person challenges the Agency's decision "to approve or disapprove a project," the

14 Compact limits the court's review "to whether there was prejudicial abuse of discretion."  *Id.* Art.

15 VI(j)(5).  "Prejudicial abuse of discretion is established if the agency has not proceeded in a

16 manner required by law or if the act or decision of the agency was not supported by substantial

17 evidence in light of the whole record."  *Id.*  "[T]he court shall not exercise its independent

18 judgment on evidence but shall only determine whether the act or decision was supported by

19 substantial evidence in light of the whole record."  *Id.*

20      In at least one case, the Ninth Circuit has given deference to the Agency's administration

21 of the Compact under *Chevron.  See Van de Kamp*, 766 F.2d at 1313 (citing 467 U.S. 837).[8]

---

[8] Although the Ninth Circuit applied *Chevron* to the Tahoe Regional Planning Agency's interpretations of the governing Compact in *Van de Kamp*, the Agency is not a federal agency; its officers act under color of state law. *Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 399 (1979); *Comm. for Reasonable Regul. of Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 365 F. Supp. 2d 1146, 1156 (D. Nev. 2005) (citing *Cal. Tahoe Reg'l Plan. Agency v. Sahara Tahoe Corp.*, 504 F. Supp. 753, 762 (D. Nev. 1980)).  State agencies' interpretations of federal law are not entitled to deference under *Chevron.  See Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1495 (9th Cir. 1997); *AT&T Commc'ns of Cal., Inc. v. Pac. Bell*, No. 97-0080, 1998 WL 246652, at *4 (N.D. Cal. May 11, 1998), *aff'd*, 203 F.3d 1183 (9th Cir. 2000).  This court need not dwell on this potential mismatch of authority.  First, *Van de Kamp* is binding no matter whether it was correctly decided.  *See Miller v. Gammie*, 335 F.3d 889, 892–93 (9th Cir. 2003)

1    Under that standard, the court first decides whether the relevant statutory terms are ambiguous.

2    *See Chevron*, 467 U.S. at 842.  If not, then "that is the end of the matter."  *Id.*  If the statute is

3    ambiguous, however, "the court does not simply impose its own construction on the statute, as

4    would be necessary in the absence of an administrative interpretation."  *Id.* at 843.  "[T]he

5    question for the court is whether the agency's answer is based on a permissible construction of

6    the statute."  *Id.*  "If it is, then the agency's interpretation controls.  A court may not supplant

7    reasonable agency regulations with its own."  *Van De Kamp*, 766 F.2d at 1313 (citing *Chevron*,

8    467 U.S. at 843).

9         This court's first task is thus to decide whether the relevant Compact provisions are

10   ambiguous.  Courts interpret the Compact using the ordinary rules of statutory interpretation.  *See*

11   *League to Save Lake Tahoe*, 739 F. Supp. 2d at 1265.  The "plain meaning of the language in

12   question" is the place to start.  *S & M Inv. Co. v. Tahoe Reg'l Plan. Agency*, 911 F.2d 324, 326

13   (9th Cir. 1990).  "If the term at issue has a settled meaning," the court "must infer that the

14   legislature meant to incorporate the established meaning, unless the statute dictates otherwise."

15   *Id.*  The Compact's structure and purpose "as a whole" can also inform the court's decision.  *Van*

16   *De Kamp*, 766 F.2d at 1314.

17        The relevant Compact provisions are unambiguous.  Under the Compact, the construction

18   of a new pier is a "project" if it is an "activity" that "may substantially affect the land, water, air,

19   space or any other natural resources of the region."  Compact Art. II(h).  Construction of a new

20   pier is a "project" under this description.  The Agency's regulations list shorezone structures

21   among the "projects" that require its approval.  *See* Code of Ordinances § 2.1.2 ("This chapter

22   identifies activities that may have a substantial effect on the land, air, water, or any other

23   resources and therefore are projects subject to [the Agency's] review and approval); *id.*

_____

(en banc).  Second, the Compact's language is unambiguous, as explained below, so this court
need not decide what deference to accord.  Third, even if *Chevron* were inapplicable, the
Agency's decisions could likely be entitled to deference nonetheless, for example under state law,
*see, e.g.*, *United Educators of San Francisco etc. v. Cal. Unemployment Ins. Appeals Bd.*,
8 Cal. 5th 805, 820 (2020), or a case-specific doctrine tailored to the Agency's unique role as the
Compact's administrator, *cf. United States v. Mead Corp.*, 533 U.S. 218, 228 (2001) (discussing
*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

§ 2.2.2(F)(2)(b) ("Shorezone Projects . . . New structures . . ."). The Agency does not argue otherwise. It agreed at hearing that a pier is a "project" under the terms of the Compact. Because pier construction is a "project," the approval procedure is prescribed by Article III(g)(2): "For approving a project, the affirmative vote of at least five members from the State in which the project is located and the affirmative vote of at least nine members of the governing body are required." The Johannessens' pier would be built in California. Compl. ¶¶ 5–7. Applying these provisions together, the Agency could approve the Johannessens' new pier only if five members of the California delegation voted affirmatively to approve it. According to the complaint, they did not, so the first claim may proceed.

The Agency advances a number of counterarguments, but none is persuasive. First, it contends the Compact permits it to delegate approval decisions to an officer or staff member. *See* Mem. Dismiss at 11–12. It is true the Compact expressly permits the Governing Board to appoint an executive officer and to employ other staff and legal counsel. *See* Compact Art. IV(a). The Compact also expressly permits the Agency to adopt rules, regulations, and ordinances. *See id.* Art. I(b)–(c), Art. III(g)(1), Art. VI(a). But the authority to appoint staff and to create rules and regulations is not the authority to modify or contradict the Compact itself. *See Van De Kamp*, 766 F.2d at 1314–15. If it were, then the Agency could override the legislatures of two states and the United States Congress. It does not have that power. "Where Congress has established a clear line, the agency cannot go beyond it; and where Congress has established an ambiguous line, the agency can go no further than the ambiguity will fairly allow." *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 307 (2013).

The Agency cites no exception to the Compact's voting rules, and the court has found none. Contrary to the Agency's argument, Article VI(b) does not excuse the pier from approval by requiring approval by "the agency." The Compact explains expressly how "the agency" can approve a project: a vote by its Governing Board under Article III(g)(2). The Agency contends Article VI(b) contemplates that a staff member could approve a project because it refers to "the agency" rather than, for example, "the board" or "governing body." *See* Mem. Dismiss at 11–12. That cannot be. If the Agency could assign a staff member to approve any projects it liked, then

1   it could bypass the voting procedure in Article III entirely.  That voting procedure would then be

2   superfluous, a result this court must avoid.  *Van de Kamp*, 766 F.2d at 1314.

3        The Agency cannot sidestep this problem by pointing out that the Board voted implicitly

4   to approve this and other projects when it voted to adopt rules and regulations delegating

5   authority to staff, as it suggested at the hearing before this court.  The Compact creates a different

6   voting procedure "[f]or adopting, amending or repealing . . . ordinances, rules and regulations,

7   and for granting variances from the ordinances, rules and regulations."  Compact Art. III(g)(1).

8   That voting procedure requires only four votes from each state's delegation.  *See id.*  If the

9   Agency were correct that it could approve a project by adopting an ordinance or procedural rule,

10  then it could bypass the stricter procedure for approving projects.

11       The Agency also emphasizes the Compact is intended "in part 'to enhance the efficiency

12  and governmental effectiveness of the region.'"  Mem. Dismiss at 12 (quoting Art. I(b)).  The

13  Agency argues it would be "unreasonable to construe the Compact to require the Governing

14  Board to vote to approve every permit the agency issues" because doing so would "bog down the

15  approval process and create needless duplication of efforts."  *Id.*  This argument has three flaws.

16       First, broad statements of purpose do not control over specific and express provisions.

17  *See, e.g.*, *Bloate v. United States*, 559 U.S. 196, 207 (2010).  The Compact's broad hortatory

18  language about efficiency does not supplant its specific language about how to approve projects.

19       Second, the Agency's argument gives short shrift to the Compact's structure, history and

20  purposes.  Efficiency is only one of the Compact's goals.  Another goal is maintaining "standards

21  for air quality, water quality, soil conversation, vegetation preservation and noise."  *Tahoe-Sierra*,

22  535 U.S. at 310 (quoting Art. II(i)).  The modern Compact has its roots in California's

23  dissatisfaction with the Agency's previous regulations, which included "numerous exceptions and

24  did not significantly limit the construction of new residential housing."  *Id.* at 309.  The court

25  hesitates to relegate that history to the background in favor of "efficiency" in approving new

26  projects.

27       Third, in response to a motion to dismiss, the court must confine its review to the

28  complaint and draw reasonable inferences in Harrosh's favor.  *Steinle*, 919 F.3d at 1160.  No

1   factual allegations justify the Agency's fears that complying with the Compact's voting rules will

2   bog down its approval process.  Nor can the court conclude at this early stage that the voting

3   requirements in Article III(g)(2) are incompatible with efficient regulation.  It is reasonable to

4   infer, for example, that the Governing Board could regulate efficiently by voting affirmatively to

5   approve all projects a hearings officer or municipal government recommends absent objections or

6   an appeal.  The court will not consider the evidence the Agency has attached to its reply in an

7   attempt to show the Board will be inundated if it were forced to vote affirmatively on every

8   project.  *See* Reply Exs. 14–18, ECF Nos. 25-1 to 25-5.  The Agency may present this evidence at

9   summary judgment or another appropriate phase.

10         The Agency suggests in its reply that the Ninth Circuit has approved of its appellate

11  procedure and its authority to delegate project decisions.  *See* Reply Dismiss at 2–3 (citing *Sierra*

12  *Club*, 840 F.3d at 1113) and Compact Art. VI(m)–(n)).  In *Sierra Club*, the Ninth Circuit did not

13  consider whether the Agency has authority to delegate approval decisions, let alone whether a

14  delegation would violate Article III(j)(2).  It simply mentioned the Agency has adopted "an

15  appeals process for all delegated projects" and a 2012 Regional Plan Update "reduced the

16  maximum size of projects that could be reviewed and approved by other agencies through an

17  Area Plan."  840 F.3d at 1113.  Nor do the Compact's provisions on contracts and agreements

18  with local government authorities address the voting provisions in Article III.  Under those

19  provisions, the Agency has authority "to initiate, negotiate and participate in contracts and

20  agreements among the local governmental authorities of the region, or any other

21  intergovernmental contracts or agreements authorized by State or Federal law."  Compact Art.

22  VI(m).  "Each intergovernmental contract or agreement shall provide for its own finding and

23  staffing, but this shall not preclude financial contributions from the local authorities concerned or

24  from supplementary sources."  *Id.* Art. VI(n).

25         The motion to dismiss the first claim is denied.  The court turns to Harrosh's request for

26  preliminary injunctive relief.

1   **III.   PRELIMINARY INJUNCTION**

2           To obtain a preliminary injunction, Harrosh must prove four things "by a clear showing":

3   he is "likely to succeed on the merits," he is "likely to suffer irreparable harm in the absence of

4   preliminary relief," "the balance of equities tips in [his] favor," and "an injunction is in the public

5   interest." *City & Cty. of San Francisco v. United States Citizenship & Immigr. Servs.*, 944 F.3d

6   773, 788–89 (9th Cir. 2019) (emphasis omitted) (first quoting *Mazurek v. Armstrong*, 520 U.S.

7   968, 972 (1997) (per curiam); then quoting *Winter v. Nat. Resources Def. Council, Inc.*, 555 U.S.

8   7, 20 (2008)).  "Alternatively, 'serious questions going to the merits and a balance of hardships

9   that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as

10  the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in

11  the public interest.'"  *Id.* at 789 (quoting *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135

12  (9th Cir. 2011)).

13          The court assumes without deciding that Harrosh is likely to obtain judgment in his favor

14  on his first claim.  He has not shown a preliminary injunction is necessary to prevent irreparable

15  harms.  Harrosh cites three potential irreparable harms: damage to the environment, "harm to the

16  enjoyment of the aesthetics of Lake Tahoe," and navigability concerns.  App. TRO at 11–12; *see*

17  *also* M. Harrosh Decl. ¶¶ 1–2, 7; S. Harrosh Decl. ¶¶ 1–2, 7.  The court focused on potential

18  environmental harms when it temporarily restrained the pier's construction, *see* TRO at 2, and it

19  starts with those potential harms here.

20          As summarized above, the Compact was created to prevent irreparable environmental

21  harms to Lake Tahoe and the surrounding watershed.  *See Tahoe-Sierra*, 535 U.S. at 309; *League*

22  *to Save Lake Tahoe*, 739 F. Supp. 2d at 1265.  Environmental concerns have thus been at the

23  center of many cases about development on the shores of Lake Tahoe.  *See, e.g.*, *Tahoe-Sierra*,

24  535 U.S. at 307–10 (summarizing Compact's history and creation); *Cal. ex rel. Van De Kamp v.*

25  *Tahoe Reg'l Plan. Agency*, 766 F.2d 1308, 1316 (9th Cir. 1985) (affirming district court's

26  decision that "algal growth in Lake Tahoe" and resulting "loss of most of the Lake's clarity" were

27  irreparable harms and justified preliminary injunction); *League to Save Lake Tahoe v. Tahoe*

28  *Reg'l Plan. Agency*, No. 08-2828, 2009 WL 3048739, at *8 (E.D. Cal. Sept. 18, 2009) (finding

1   "construction or installation of boating facilities is likely to cause irreparable injury").  As a

2   result, irreparable environmental harms might be the result of noncompliance with the Compact.

3   *See, e.g.*, *Van De Kamp*, 766 F.2d at 1324; *Van De Kamp*, 766 F.2d at 1316.  For example, if the

4   Agency has adopted a voting procedure that is more permissive than the procedure laid out in

5   Article III of the Compact, and if it uses that procedure repeatedly, then it might approve more

6   projects than it otherwise would have, and these projects might lead to increased sediment

7   deposits and algal growth and irreparable environmental harms.

8          Harrosh cites the Compact's broad environmental purposes and cases in which federal

9   courts have enjoined actions that risked irreparable harm to the environment.  *See* App. TRO at

10   11–12.  At hearing, his counsel argued any unpermitted project is itself an irreparable

11   environment harm.  But he has not shown irreparable environmental harm is likely if construction

12   continues on the Johannessen's pier while this case is pending, a question the court must consider.

13   The evidence weighs in favor of the opposite conclusion.  The Johannessens engaged a consultant

14   to prepare an environmental assessment as part of their permit application.  *See* Stock Decl.

15   ¶¶ 6–7, ECF No. 36-2; Envt. Assessment, Stock Decl. Ex. A, ECF No. 36-2.  The consultant,

16   whose credentials Harrosh does not challenge, visited the construction site and evaluated the

17   "overall existing environment, the littoral benthic sediment distribution patterns in the area, the

18   fish habitat and fisheries in the area."  Envt. Assessment at 3. He also conducted

19   "[r]econnaissance of the shoreline . . . to evaluate the potential habitat for the endangered (State

20   of California) Tahoe yellow cress," reviewed "[r]elevant scientific literature," and interviewed

21   "scientists having expertise in the relevant areas (e.g., fisheries)."  *Id.*  He concluded "[o]verall,

22   the construction of a new single-family pier will have no negative impact on the water quality,

23   littoral sediment transport, fisheries, and fish habitat of Lake Tahoe."  *Id.* at 23.  "Therefore," he

24   wrote, "the project will have no adverse environmental impacts on the environment of  Lake

25   Tahoe at this specific location."  *Id.*  Harrosh offers no evidence to rebut or refute these opinions.

26          In short, while irreparable environmental harms are possible, the possibility of

27   environmental harm does not justify a preliminary injunction.  *See Winter*, 555 U.S. at 21.

28   "[P]laintiffs seeking preliminary relief" must "demonstrate that irreparable injury is *likely* in the

1    absence of an injunction." *Id.* at 22 (emphasis in original).  "Issuing a preliminary injunction

2    based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's]

3    characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a

4    clear showing that the plaintiff is entitled to such relief." *Id.*  Harrosh has not shown irreparable

5    harms to the environmental are likely, so the potential harms do not justify injunctive relief.

6          Harrosh also argues if construction continues while this case is pending, the lake's

7    "aesthetics" will suffer, as the construction site will be an "eyesore."  App. TRO at 12.  He has

8    not shown this harm would be irreparable.  If Harrosh ultimately proves, as he alleges, that the

9    Agency's voting process violates the Compact, then the Agency could still approve the pier in a

10   vote that complies with the Compact.  If the Johannessens cannot obtain a permit, the pier could

11   be removed and Harrosh could be compensated with damages, if damages are appropriate.[9]  He

12   cites no authority to show these remedies would not suffice to remedy a temporary, personal,

13   aesthetic interest, and the court is aware of none.  *Cf., e.g.*, *Tutein v. Insite Towers, LLC*, No. 12-

14   071, 2013 WL 309056, at *5 (D.V.I. Jan. 25, 2013) (finding "unsightly tower," an alleged

15   "eyesore," was not "irreparable harm" justifying preliminary injunction); *Del Don v. Vilsack*, No.

16   10-126, 2010 WL 476719, at *3 (E.D. Cal. Feb. 3, 2010) (holding "temporary restriction" on use

17   of real property improvements was not "irreparable harm" justifying temporary restraining order).

18         Finally, Harrosh argues if the court does not enjoin the pier's construction, it will be more

19   difficult and dangerous to use the pier on his own property.  *See* App. TRO at 12; M. Harrosh

20   Decl. ¶ 2.  He and Samuel Harrosh aver in declarations that "[t]he proposed pier would

21   substantially reduce the existing clearance on the North side of the Harrosh Pier, preventing

22   watercraft . . . from safely operating in the vicinity."  M. Harrosh Decl. ¶ 2; *accord* S. Harrosh

23   Decl. ¶ 2.  Harrosh has not offered information about particular boats, weather and water

24   conditions, clearances, or similar specifics that might support their safety concerns.  The court

25   cannot conclude on this record that Michael or Samuel Harrosh are qualified to offer opinions

26   about the pier's safety beyond their personal knowledge.  *See* Fed. R. Evid. 701, 702.  Other

---

[9] Although Harrosh asks for nominal damages expressly, he also asks for "any other relief that the Court deems just and proper under the circumstances of this case."  Compl. at 26.

1    evidence also undercuts their safety claims.  According to a Staff Report prepared for the hearings

2    officer, for example, the pier will not "impact navigation or create a threat to public safety."  Staff

3    Report Attachment. A ¶ 2(g), Req. J. Not. Ex. 11, ECF No. 16.  Harrosh has not cited evidence

4    showing other agencies that approved the pier, such as the Army Corps of Engineers, voiced

5    concerns about navigation or safety.  At the preliminary injunction hearing, his counsel

6    challenged the Corps's findings and noted an ongoing administrative dispute related to the

7    Corps's approval, but he did not offer evidence beyond the testimony cited above.

8           On this record, it is possible the Johannessens' pier will make navigation more difficult or

9    dangerous, but Harrosh has not shown that harm is likely.  Finally, even if navigation will likely

10   be more difficult or dangerous, Harrosh has not offered evidence to show these difficulties and

11   dangers cannot be mitigated or otherwise addressed; he has not shown these harms are

12   "irreparable."

13   **IV.    INJUNCTION PENDING APPEAL**

14          Harrosh also now asks the court to enjoin the pier's construction while he appeals this

15   order.  Mot. Stay Pending Appeal, ECF No. 42.  The federal rules give district courts the authority

16   to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure

17   the opposing party's rights" while an appeal is pending.  Fed. R. Civ. P. 62(d).  The test district

18   courts use when asked to issue injunctions pending appeal is essentially the same as the test that

19   applies to a motion for a preliminary injunction or a stay pending appeal, although they are not

20   identical.  *See Nken v. Holder*, 556 U.S. 418, 426, 429 (2009); *Leiva-Perez v. Holder*, 640 F.3d

21   962, 966 (9th Cir. 2011).  The court considers whether the moving party has demonstrated it is

22   "likely to succeed on the merits" and "likely to suffer irreparable harm in the absence of

23   preliminary relief" and whether the balance of harms and public interests weigh in favor of an

24   injunction.  *S. Bay United Pentecostal Church v. Newsom*, 959 F.3d 938, 939 (9th Cir. 2020).

25          Harrosh argues irreparable environmental harms are likely absent an injunction because an

26   unpermitted pier is a "project" that "by definition . . . may substantially affect the land, water, air,

27   space or any other natural resources of the [Lake Tahoe] region."  Mot. Stay Pending Appeal at 5

28   (emphasis omitted).  He points out the Compact "expresses a legislative judgment that

25

1   development and urbanization of the Lake Tahoe region pose a threat to the 'irreparable'

2   environmental and ecological values of the region." *Id.* (emphasis omitted) (quoting TRO at 2, in

3   turn quoting *Van De Kamp*, 766 F.2d at 1324).  But an injunction cannot rest on proof that the

4   pier "may substantially affect" the environment; the moving party must identify a "harm" not an

5   effect, and that harm must be both "likely" and "irreparable."  *Winter*, 555 U.S. at 20; *S. Bay*

6   *United Pentecostal*, 959 F.3d at 939.  Harrosh has not done so.

7        In his motion for an injunction pending appeal, Harrosh also argues for the first time that

8   irreparable environmental harms are likely because driving piles into the lakebed creates a loud

9   noise.  Mot. Stay Pending Appeal at 5–6.  He cites Compact provisions establishing decibel limits

10  for a variety of activities.  *See id.* at 6 (citing Prows Decl. Ex. 1 at 13–14, ECF No. 42-3).  He also

11  cites a 1971 EPA study reporting that jack hammers, rock drills, and pile drivers can be as loud as

12  90–100 dB at 50 feet, which is higher than some of the limits in the cited Compact pages.  *See id.*

13  (citing Prows Decl. Ex. 2 at 11).  This argument is unavailing.  The cited Compact limits do not

14  mention construction noise.  And even if construction noise would exceed the Compact's limits,

15  Harrosh again assumes without proof that irreparable environmental harm is the likely result of

16  every Compact violation.  Noise and vibration might well disturb plants and animals or cause

17  other harms, but no evidence in the record shows that is so, and no evidence shows those harms

18  would be irreparable.  The motion for an injunction pending appeal is denied.

19  **V.   CONCLUSION**

20        In conclusion, the court orders as follows:

21  •    The stipulation at ECF No. 28, construed as an unopposed request for leave to

22       amend the complaint, is **granted**.  An amended complaint omitting the fourth

23       claim must be filed **within seven days**.

24  •    With respect to the complaint's first claim, the motion to dismiss (ECF No. 14) is

25       **denied**.  With respect to the complaint's fourth claim, the motion to dismiss is

26       **denied as moot**.

1   • The temporary restraining order (ECF No. 35) is **dissolved.**  The court declines to

2   convert the temporary restraining order into a preliminary injunction.  *See* Fed. R.

3   Civ. P. 65(b)(2)–(4).

4   • The motion for an injunction pending appeal (ECF No. 42) is **denied**.

5   • As discussed at the November 8, 2022 hearing, this matter is **referred to a**

6   **settlement conference before the assigned magistrate judge.**

7   • The deadline for hearing any dispositive motions of any type, including for

8   summary judgment or judgment on the pleadings, is set for **March 10, 2023 at**

9   **10:00 a.m.** before the undersigned.  This order does not preclude any party from

10   noticing any dispositive motion before that deadline, if otherwise permitted by the

11   Federal Rules of Civil Procedure and this District's local rules.

12   IT IS SO ORDERED.

13   DATED:  November 10, 2022.

CHIEF UNITED STATES DISTRICT JUDGE