1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9              FOR THE EASTERN DISTRICT OF CALIFORNIA
10

11   Michael Harrosh,                          No. 2:21-cv-01969-KJM-JDP

12                    Plaintiff,                ORDER

13        v.

14   Tahoe Regional Planning Agency, et al.,

15                    Defendants.

16

17        A hearings officer of the Tahoe Regional Planning Agency approved George and Virginia
18   Johannessen's proposal to build a pier on their lakefront residential lot.  Michael Harrosh, the
19   Johannessens' neighbor, opposed their proposal.  He appealed the hearings officer's decision, and
20   the Agency's governing board rejected Harrosh's appeal in an eleven-to-zero vote.  Harrosh
21   alleges in this case that the governing board's vote fell short of a specific double supermajority
22   voting requirement imposed by the interstate compact that governs development around Lake
23   Tahoe.  He also alleges the pier is too long and unsafe.
24        The parties have each moved for summary judgment.  As explained in this order, the
25   governing board's vote fell short of the compact's requirements.  For that reason, the vote was not
26   effective to approve the Johannessens' pier.  Harrosh has not proven, however, that the Agency
27   erred in rejecting his arguments about the pier's length and safety.  The court remands the matter
28   to the Agency for further proceedings consistent with this order.

                                          1

1    **I.     BACKGROUND**

2          California and Nevada have struggled for decades to protect Lake Tahoe's unique beauty.

3    *See, e.g.*, *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 307–08 &

4    nn.2–3 (2002); *People ex rel. Younger v. County of El Dorado*, 5 Cal. 3d 480, 485–86 (1971).

5    Many overlapping state, federal and local governments and their agencies have jurisdiction over

6    the surrounding basin.  *See, e.g.*, Report of the Lake Tahoe Joint Study Comm. (Joint Study Rep.)

7    at 5 (Mar. 1967); *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 739 F. Supp. 2d 1260,

8    1265 (E.D. Cal. 2010), *aff'd in relevant part, vacated in part, and remanded*, 469 F. App'x 621

9    (9th Cir. 2012) (unpublished).

10          In the 1960s, California and Nevada began studying the possibility of charging a new joint

11   agency with regulating development around Lake Tahoe.  *See* Joint Study Rep. at 7 (citing Cal.

12   S.B. 149 (1965) and Nev. A.B. 552 (1965)).  A committee formed to study the issue urged

13   immediate action.  *See* Joint Study Rep. at 5.  In response, California proposed a self-sufficient

14   agency tasked with protecting the lake as a "national treasure" and "a rich natural asset" of the

15   people of both states.  Note, Gary J. Spradling, *Regional Government for Lake Tahoe*, 22

16   Hastings L.J. 705, 709 (Feb. 1971) (quoting Cal. A.B. 1362 § 1 (1967)).  Nevada proposed a

17   weaker agency, one that was effectively subject to the control of the surrounding local

18   governments.  *See id.* at 713–14 (summarizing Nev. Rev. Stat. § 277.200 (1968)).  The

19   compromise that resulted from these negotiations became the Tahoe Regional Planning Compact,

20   which Congress approved in 1969 under the U.S. Constitution's Compact Clause.  *See* Pub. L.

21   No. 91-148, 83 Stat. 360 (Dec. 18, 1969).  The Compact in turn created the Tahoe Regional

22   Planning Agency, or TRPA, which was charged with adopting rules, regulations and policies to

23   "enforce a regional plan of resource conservation and orderly development."  *Id.* Art. I(c).

24          Litigation began soon after the Compact was approved.  Local governments disagreed

25   about their obligations.  *See, e.g.*, *Younger*, 5 Cal. 3d at 4885, 490.  Landowners argued Agency

26   rules were so restrictive that they amounted to unconstitutional takings.  *See, e.g.*, *Tahoe-Sierra*,

27   535 U.S. at 313 & n.6; *Brown v. Tahoe Reg'l Plan. Agency*, 385 F. Supp. 1128, 1134 (D. Nev.

28   1973).  And in many cases, environmental advocates and state authorities have challenged the

1    Agency's decisions as falling short of what is necessary to protect the lake. *See, e.g.*, *Sierra Club*

2    *v. Tahoe Reg'l Plan. Agency*, 840 F.3d 1106, 1107–08 (9th Cir. 2016); *People ex rel. Van De*

3    *Kamp v. Tahoe Reg'l Plan. Agency*, 766 F.2d 1308, 1312 (9th Cir. 1985); *League to Save Lake*

4    *Tahoe v. Tahoe Reg'l Plan. Agency*, 507 F.2d 517, 518–19 (9th Cir. 1974); *League to Save Lake*

5    *Tahoe*, 739 F. Supp. 2d 1266–67.

6          One series of cases centered on a plan to build hotels and casinos near the lake. The

7    conflict eventually yielded several published Ninth Circuit decisions in the 1970s.[1] At the time,

8    the Agency's governing board was composed of two five-member delegations, one from each

9    state. *See Younger*, 516 F.2d at 216–17; *Cal. Tahoe Plan. Agency*, 594 F.2d at 185–86 & n.4.

10   The Agency could "take action" only by the "majority vote of the members present representing

11   each state." *Younger,* 516 F.2d at 217 (quoting Pub. L. No. 91-148 art. III(g)). If a proposal did

12   not garner this double-majority vote, it was "deemed approved." *Id.* (quoting Pub. L. No. 91-147

13   art. VI(k)). The California delegation had rejected the hotel and casino proposal unanimously.

14   *See id.* The Nevada delegation, by contrast, had split: three members had voted in favor of the

15   project, and two had voted against it. *See id.* In total, seven members of the Agency's ten-

16   member board voted *against* the project. Despite the clear majority vote against the project, it

17   was approved by default because a majority of the Nevada delegation had voted in favor. *See id.*

18   at 219–20. As one court later put it, the original compact's voting rules "subordinated the

19   composite decision of the seven-member majority . . . to the decision of the Nevada minority."

20   *Raley v. California Tahoe Reg'l Plan. Agency*, 68 Cal. App. 3d 965, 980 n.10 (1977).

21          California took its case to federal court. Although the Ninth Circuit found "California's

22   argument extremely appealing on an emotional level, it simply [did] not take into account the

23   plain meaning of the Compact and the intent of its architects." *Younger*, 516 F.2d at 218. "[T]he

24   Compact may not be a powerful anti-growth measure in that it permits a majority of one state to

---

[1] *See, e.g.*, *Cal. Tahoe Reg'l Plan. Agency v. Jennings*, 594 F.2d 181, 186–87 (9th Cir. 1979); *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 558 F.2d 914, 916 (9th Cir. 1977); *California ex rel. Younger v. Tahoe Reg'l Plan. Agency*, 516 F.2d 215, 215, 219 (9th Cir. 1975); *League to Save Lake Tahoe v. Tahoe Reg'l Plan. Agency*, 507 F.2d 517, 518–19 (9th Cir. 1974).

1    stop effective action," the circuit court wrote, but that was "not the result of a court imposed

2    interpretation." *Id.* at 220.  It was instead the result "of deliberate action by the legislatures of

3    Nevada and California and the Congress of the United States." *Id.*  California's road to a remedy

4    was not through the courts, the Circuit held, but instead through the two states' own legislatures

5    and Congress.  *Id.*

6        The Agency's apparent incapacity to forestall development around Lake Tahoe persuaded

7    California the original compact was too weak.  *See Tahoe-Sierra Pres. Council, Inc. v. Tahoe*

8    *Reg'l Plan. Agency*, 34 F. Supp. 2d 1226, 1233 (D. Nev. 1999), *aff'd in relevant part*, 216 F.3d

9    764 (9th Cir. 2000), *and aff'd*, 535 U.S. 302 (2002).  It withheld funding from the Agency and

10   began enforcing stricter regulations within its own territory.  *See id.*  But the two states eventually

11   resolved their conflict and agreed to amend the compact.  Congress approved the amendment in

12   1980.  *See* Pub. L. No. 96-551, 94 Stat. 3233 (Dec. 19, 1980).

13       The 1980 compact is, for the most part, the same as the Compact in force today.[2]  It

14   imposes heavier obligations on the Agency than its predecessor to protect against degradation and

15   to limit development.  For example, the Compact now singles out "[i]ncreasing urbanization" as a

16   threat to the region, and it requires the Agency to create "[e]nvironmental threshold carrying

17   capacit[ies]," that is, standards "necessary to maintain a significant scenic, recreational,

18   educational, scientific, or natural value of the region or to maintain public health and safety

19   within the region."  Art. I(a)(5) & II(i).  The Agency also must prepare environmental impact

20   statements for projects.  *See* Art. VII.  The Compact defines "[p]roject" as an "activity undertaken

21   by any person, including any public agency, if the activity may substantially affect the land,

22   water, air, space or any other natural resources of the region."  Art. II(h).

23       The 1980 amendments also changed the Agency's governing board and voting

24   procedures.  *See* Art. III.  As before, the board includes two delegations, one from California and

---

[2] For simplicity, the court refers to this document as "the Compact" in this order, including the amendments passed as part of the Water Infrastructure Improvements for the Nation Act § 3603(f)(2), Pub. L. No. 114-322, 130 Stat. 1628, 1789 (Dec. 16, 2016).  A copy is available on the docket of this action at ECF No. 32.  Unless otherwise stated, all citations to Articles and their subjections (e.g., "Art. I(a)") refer to the those within the Compact.

1    one from Nevada.  *See id.* Art. III(a)(1)–(2).  But rather than five members, the state delegations

2    now each have seven members: three local residents appointed by the surrounding counties and

3    cities and four others appointed by state officials who represent the respective states at large.  *See*

4    *id.*  With a few exceptions, the members at large must not be residents of the Tahoe region.  *See*

5    Art. III(a)(1)(B).

6        The voting procedures also changed, and they vary depending on the purpose of the vote.

7    There are three basic procedures.  One is for decisions about certain environmental thresholds, the

8    Agency's regional plans, and its rules and regulations.  *See id.* Art. III(g)(1).  Under this first

9    procedure, "the vote of at least four of the members of each State agreeing with the vote of at

10   least four members of the other State shall be required to take action."  *Id.*  Another voting

11   procedure governs "routine business" and decisions to give directions to the agency's staff on

12   "litigation and enforcement actions."  *Id.* Art. III(g)(3).  For these matters, a simple majority of

13   "at least eight members of the governing body must agree to take action."  *Id.*

14       For this case, however, the most important procedure is the one that applies to votes on

15   specific projects.  A project must have support in not only "the affirmative vote of at least five

16   members from the State in which the project is located," but also in "the affirmative vote of at

17   least nine members of the governing body" as a whole.  *Id.* Art. III(g)(2).  No longer could the

18   views of a minority from just one state override the overall board majority.  Nor could one state's

19   delegation impose its will on the other, at least not for projects in the other's territory: if a project

20   does not secure five-plus-nine-vote double-supermajority approval, then "upon a motion for

21   approval, an action of *rejection* shall be deemed to have been taken."  *Id.* Art. III(g)(2) (emphasis

22   added).  The 1980 amendment thus scuttled the approval-by-default rule that California had

23   fought in federal court.  Now, "[w]henever . . . the agency is required to review or approve any

24   project, public or private, the agency shall take final action by vote, whether to approve, to

25   require modification or to reject such project, within 180 days after the application for such

26   project is accepted as complete . . . unless the applicant has agreed to an extension of this time

27   limit."  Art. III(g).  If the agency does not vote within 180 days after it receives a final

28   application, then the applicant may ask a court to compel a vote.  *Id.*  Neither a failed vote nor a

1   failure to vote is deemed an approval.  *Compare* 1969 Compact Art. VI(k) *with* 1980 Compact

2   Art. III(g).

3          These amendments did not halt litigation about development around Lake Tahoe.  Some

4   disputes eventually wound their way to the United States Supreme Court.  *See, e.g.*, *Tahoe-Sierra*,

5   535 U.S. at 313 & n.6.  And yet, as noted above, except for a modification approved in 2016, the

6   Compact has remained the same since 1980.  *See* Pub. L. 114-332, 130 Stat. 1628, 1789 (Dec. 16,

7   2016) (amending Article V).

8          In comparison to the decades-long legal clashes highlighted above, this case is a relatively

9   small one.  Its roots were laid in 2018, when the Agency modified its regional plan and allowed

10  128 new private piers to be constructed around Lake Tahoe.  Tahoe Reg'l Plan. Agency Code of

11  Ordinances § 84.4.4(A) (as amended Sept. 27, 2023).[3]  Of those 128 new piers, the Agency

12  allowed only twenty-five to be constructed on single parcels, and it held a lottery to decide who

13  could apply.  *See id.* § 84.4.4(C)(1).  George and Virginia Johannessen own a residential lot in

14  California on the west shore of Lake Tahoe.  *See* AR0001-N.  They participated in the lottery and

15  won the right to apply for a permit to construct a pier on that lot.  *Id.*  They applied, AR0001-A to

16  AR0001-MMMM, AR0001–50, and the Agency's staff reviewed their application and

17  recommended approving it, AR 0835–0989.

18         In the case of the Johannessens' application, as in others like it, the Agency's regulations

19  delegated the approval decision to a hearings officer.  *See* Code § 2.2.2(F).  That is, the Agency's

20  governing board did not take up the question of approval itself, at least not in the first instance.

21  The hearings officer presided over a hearing on the Johannessens' application in 2021.  AR1825

22  (audio recording).  Their neighbor to the south, Michael Harrosh, opposed their application at the

23  hearing.  *Id.*  The hearings officer followed the Agency's staff recommendation and issued a

24  permit.  AR1826–50.

---

[3] The court takes judicial notice of the publicly available Code of Ordinances as well as the Agency's publicly available Rules of Procedure, as amended on January 22, 2025, which are cited as the "Code" and "Rules," respectively, in this order.

1        Harrosh appealed the hearings officer's decision to the Agency's governing board, as its

2   regulations permit.  *See* AR 1852–53, 1877–79, 2462–72; Code § 2.2.2(G)(3); Rules Art. 11.2.

3   He prepared a mandatory "Statement of Appeal," which explains he was acting both on his own

4   behalf and on behalf of "the Harrosh family," which included Samuel N. Harrosh, Lynne

5   Harrosh, Suzanne C. Harrosh and Aaron Harrosh.  AR 1852–53, 1877; Rules Arts. 11, 14.  He

6   contended the pier did not comply with Compact and Code provisions on safety, interference with

7   nearby properties, navigation and the environment.  AR 1867–68.  He argued, for example, that

8   the proposed pier was too long.  AR 1868.  But he did not contest the Agency's authority to

9   delegate decisions to hearings officers in general, he did not question the hearings officer's

10  authority to make a decision or preside over the hearing and he did not question the appellate

11  process itself.

12       The Board took up Harrosh's appeal at a hearing in August 2021.  *See* AR 2455, 2462.

13  Harrosh appeared through his attorney and personally.  *See* AR 2463–65, 2470–71.  The

14  Agency's general counsel, John Marshall, explained to the board that because the appeal had

15  come to the board following the hearings officer's decision to approve the application, the appeal

16  was "similar to a revocation hearing."  AR 2462.  "That's why," in Marshall's assessment, "the

17  vote comes forward to the board with the requirement that if the board is going to overturn the

18  appeal, it will take five California votes and nine votes overall."  *Id.*

19       Harrosh, the Johannessens and the Agency's staff gave presentations to the governing

20  board's legal committee, which recommended denying the appeal.  AR2367–2402, 2433, 2462–

21  72.  According to the meeting's minutes, Harrosh's counsel focused on the Agency's regulations,

22  the pier's length and public safety.  *See* AR 2463–65.  Harrosh argued on his own behalf that the

23  Johannessens' pier would "make it very difficult and, in some conditions, unable [sic] to come

24  into [his family's] pier."  AR 2471.  He also asked why the board had put the burden on him to

25  secure a supermajority vote: "Why does it take five votes, a supermajority to overturn this when

26  it's supposed to be a supermajority to approve it?" he asked.  AR 2471.  "Not even a majority of

27  the board members has a say as to . . . what goes on in this lake and can overturn staff.  How does

28  that work and how does that help the board continue to protect the lake?"  *Id.*

1    The board voted against Harrosh eleven to zero.  AR 2472.  This meant three votes of the

2  total fourteen possible votes were not cast:

3       • One board member, a member of the California delegation, abstained from voting

4          due to her previous relationship with the Harrosh family.  AR 2462, 2472.

5       • Two other seats on the California delegation were vacant at the time.  *See* Am.

6          Compl. ¶¶ 81–82, ECF No. 52; TRPA Answer ¶¶ 81–82, ECF No. 55;

7          Johannessens' Answer ¶¶ 81–82, ECF No. 56.

8  As a result, although eleven out of the fourteen total votes were cast in favor of the

9  Johannessens—a "no" vote from every voting board member—only four votes from the

10  California delegation were cast in the Johannessens' favor.

11    Harrosh then filed this action against the Agency and the Johannessens.  *See generally*

12  Compl., ECF No. 1.  He alleged the vote was ineffective to approve the Johannessens' pier

13  because the pier was a "project" that could be approved only with five affirmative votes from the

14  California delegation.  *See* Compl. ¶¶ 108–20.  He also alleged the pier was longer than the

15  Agency's regulations allowed, *id.* ¶¶ 121–27, and was unsafe, *id.* ¶¶ 138–51, and he alleged the

16  Agency's decision had deprived him of due process in violation of the Fifth Amendment, *id.*

17  ¶¶ 152–68.  Later, he dropped his Fifth Amendment claim, leaving only the disputes about the

18  Agency's voting procedure and the pier's safety and length.  *See* Order on Mot. Dismiss (Nov.

19  10, 2022) at 6, ECF No. 48; *see also* Am. Compl. ¶¶ 108–51 (asserting claims one through three

20  of the original complaint).

21    The Agency moved to dismiss Harrosh's first claim under Rule 12(b)(6).  While its

22  motion was pending, Harrosh moved for a preliminary injunction barring the pier's construction,

23  relying only on his first claim about the required voting procedure.

24    The court first denied the motion to dismiss.  Harrosh's allegations supported a plausible

25  claim based on the Compact's voting requirements.  According to his complaint, the Agency had

26  approved the pier even though only four members of the California delegation had voted to do so,

27  contrary to the Compact's voting procedures for projects.  *See* Order on Mot. Dismiss at 17–21,

28  ECF No. 48.  The court also considered and rejected two procedural arguments the Agency

8

advanced in its motion.  First, the Agency argued Harrosh could have and should have challenged the voting procedure when he made his presentation to the hearings officer or the board.  The court could not conclude, based on the complaint alone, that Harrosh did not raise the issue but could and should have done so.  *See id.* at 7–14.  Second, the Agency argued Harrosh's claim should not move forward because, in reality, it was an untimely challenge to regulations the Agency had adopted many years before.  But again, with only Harrosh's allegations to consider, the court could not agree his claim was untimely.  *See id.* at 14–17.

Although the court denied the motion to dismiss, it did not grant Harrosh's request for a preliminary injunction.  He did not show he would suffer irreparable harm in the absence of a preliminary injunction, so he was not entitled to that relief.  *See id.* at 22–25.  Harrosh appealed the court's order but later dismissed his appeal voluntarily.  *See* Order Dismissing Appeal, ECF No. 57.

The parties then agreed the case should be resolved by dispositive motions.  After the court resolved a preliminary dispute about the administrative record, *see generally* Order on Mot. Suppl., ECF No. 89, the parties filed and fully briefed cross-motions for summary judgment, *see generally* Harrosh Mot., ECF No. 95; Agency Mot. & Opp'n, ECF No. 96; Johannessens' Opp'n, ECF No. 97; Johannessens' Mot., ECF No. 98; Harrosh Reply & Opp'n, ECF No. 101; Agency Reply, ECF No. 103; Johannessens' Reply, ECF No. 104.  Harrosh seeks summary judgment on his first and second claims, i.e., those related to the board's vote and the pier's length, respectively.  He does not seek summary judgment on his third claim, i.e., the claim related to safety and navigability.  Defendants seek summary judgment in their favor on all three claims.

In addition to summary judgment, Harrosh seeks judgment on the pleadings on his first claim only, and that motion is fully briefed as well.  *See generally* Mot. J. Pleadings, ECF No. 60; Agency Opp'n J. Pleadings, ECF No. 71; Johannessens' Opp'n J. Pleadings, ECF No. 72; Reply J. Pleadings, ECF No. 74.

After reviewing the parties' briefs, the court directed them to file supplemental briefs addressing whether California and Nevada had interests in this action that made them necessary parties under Federal Rule of Civil Procedure 19.  *See generally* Order (Sept. 7, 2023), ECF

9

1   No. 106.  In response, the parties filed a stipulated request to permit California and Nevada to file

2   amicus curiae briefs, which the court approved.  ECF No. 108.  The two states' attorneys general

3   have now filed amicus briefs.  *See* Cal. Br., ECF No. 109; Nev. Br., ECF No. 111.[4]  The parties

4   also have now filed their own supplemental briefs.  *See generally* Harrosh Suppl. Br., ECF No.

5   112; Agency Suppl. Br., ECF No. 113; Johannessens' Suppl. Br., ECF No. 114.

6        If California and Nevada have interests in this case, and if they cannot be joined, then it

7   might be necessary to dismiss this action without considering the parties' pending motions.  *See*

8   Fed. R. Civ. P. 19(b).  For that reason, the court begins with Rule 19.

9   **II.     CALIFORNIA'S AND NEVADA'S PARTICIPATION**

10        As summarized above, the parties advance different interpretations of the Compact's

11  voting requirements.  Harrosh contends the Compact unambiguously requires five affirmative

12  votes by the California delegation, and nine affirmative votes overall, for all projects, including

13  the Johannessens' pier.  Harrosh Mot. at 6.  The Agency argues the Compact permits the

14  governing board to delegate project decisions to hearings officers and other staff members, and it

15  argues California and Nevada have consented to those delegations.  Agency Mot. at 14–15, 19–

16  21.

17        No matter how the court resolves that dispute, its decision could reverberate beyond this

18  case.  If, for example, the court agrees with Harrosh that the board's vote was ineffective, that

19  decision could imply the governing board itself must approve all projects using the five-and-nine-

20  member supermajority voting procedure.  The Agency claims without contradiction that it must

21  consider hundreds of project applications every year, and it contends its work could grind to a halt

22  if the governing board were required to consider and vote on each one.  *See id.* at 13–14.  The

23  Agency also argues a ruling in Harrosh's favor would give the Agency and its governing board an

24  incentive to narrow the definition of "project."  *See id.*  If the Agency narrows the definition of

25  project, then its regulatory oversight role would diminish.  *See id.*

---

[4] The motion at ECF No. 110 for an extension of time to file the Nevada brief is granted.

Despite these potential wider implications, California and Nevada believe "the specific factual circumstances of this case" are not so serious that their direct participation as parties is necessary. Cal. Br. at 3; *see also* Nev. Br. at 1 (joining California's position). But they do emphasize that their views would likely differ in cases "with broader social, economic, or environmental ramifications." Cal. Br. at 3. The two states also suggest they probably would not agree with the Agency's interpretation of the Compact, at least not completely, if they were to participate. For one, California notes in the margin of its amicus brief that "an appeal, or any matter, typically should only be heard by the Governing Board when sufficient members are available to make the required vote for the requested action." Cal. Br. at 4 n.2. California also expressly disagrees with the Agency's claim that the two states have "waived any ability to take contrary positions" to the Agency on "delegation or appeal procedures, or for that matter, any aspect of the Regional Plan, Code of Ordinances, or Rules of Procedure." *Id.* at 5 n.3.

Despite these potential differences between the states' positions and those of the parties in this case, Harrosh and the Agency agree with California and Nevada that this case can and should proceed in the two states' absence. *See generally* Harrosh Suppl. Br. at 1; Agency Suppl. Br. at 1. The Johannessens disagree. They argue the court should dismiss this action under Rule 19. *See* Johannessens' Suppl. Br. at 9–11.

"Rule 19(a) requires joinder of a party whose presence is necessary to ensure complete relief among the existing parties, or to protect a party whose interests would be impaired or impeded were the action to proceed without that party." *Deschutes River All. v. Portland Gen. Elec. Co.*, 1 F.4th 1153, 1162–63 (9th Cir. 2021). "If joinder is not feasible, Rule 19(b) requires dismissal when the action cannot proceed 'in equity and good conscience' without the required party." *Id.* (quoting Fed. R. Civ. P. 19(b)). In other words, Rule 19 requires dismissal only if three things are true: an absent person is a "required party," that person cannot be joined, and the case cannot "fairly proceed in that party's absence." *Jamul Action Comm. v. Simermeyer*, 974 F.3d 984, 996 (9th Cir. 2020). In all, "[t]he determination is heavily influenced by the facts and circumstances of each case." *E.E.O.C. v. Peabody W. Coal Co.*, 610 F.3d 1070, 1081 (9th Cir. 2010) (quoting *N. Alaska Envt'l Ctr. v. Hodel*, 803 F.2d 466, 468 (9th Cir. 1986)).

1        The first question, then, is whether California and Nevada are "required" parties.  Rule

2 19(a) lists three circumstances that can make a person[5] a "required party."  First, a person is

3 required as a party if "in that person's absence, the court cannot accord complete relief among the

4 existing parties."  Fed. R. Civ. P. 19(a)(1)(A).  "This factor is concerned with consummate rather

5 than partial or hollow relief as to those already parties, and with precluding multiple lawsuits on

6 the same cause of action."  *Disabled Rts. Action Comm. v. Las Vegas Events, Inc.*, 375 F.3d 861,

7 879 (9th Cir. 2004) (quoting *Northrop Corp. v. McDonnell Douglas Corp.*, 705 F.2d 1030, 1043

8 (9th Cir. 1983)).  If Harrosh prevails, the court could grant complete relief to him by issuing a

9 declaration or injunction or by remanding the case to the Agency for further administrative

10 proceedings.  That would be true no matter whether California and Nevada were part of the case.

11 So for the first of the three circumstances listed in Rule 19(a), California and Nevada are not

12 required parties due to the need for "complete relief."  Fed. R. Civ. P. 19(a)(1)(A).

13        Second, an absent person's participation can be necessary if that person "claims an

14 interest relating to the subject of the action and is so situated that disposing of the action in the

15 person's absence may . . . as a practical matter impair or impede the person's ability to protect the

16 interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).  Both California and Nevada claim interests "relating to

17 the subject of this action."  As summarized above, Harrosh's dispute with the Agency and the

18 Johannessens focuses on the Compact's voting procedures and the Agency's related regulations.

19 California and Nevada are the compacting parties.  They negotiated, then renegotiated the

20 Compact's voting provisions after years of litigation about the governing board's authority.  They

21 also argue in their current amicus briefs that they have a right to raise objections to a hearings

22 officer's exercise of delegated authority.  *See* Cal. Br. at 3; Nev. Br. at 1 (joining California's

23 brief).  But in the particular circumstances of this case, neither state's absence would, "as a

24 practical matter," prevent them from protecting those interests.  They have participated in this

25 case as amici curiae and have specifically disclaimed any interest in litigating Harrosh's claims.

---

[5] Although Rule 19 uses the word "person," which might imply it does not refer to states or other government or sovereign entities, courts have interpreted Rule 19 more broadly.  *See, e.g., Jamul Action Comm.*, 974 F.3d at 997 (holding federally recognized tribe necessary); *Carlson v. Tulalip Tribes of Wash.*, 510 F.2d 1337, 1339 (9th Cir. 1975) (same for United States).

1    In addition, no party contends this court's interpretation of the Compact's voting procedures

2    would bind California or Nevada in a different case about a different applicant and a different

3    project.  This court is aware of no authority showing it would.  For these reasons, California and

4    Nevada are not required parties based on any risks this case might create for the states' own

5    interests.

6           Third, an absent party's participation can be necessary if, again, that party "claims an

7    interest relating to the subject of the action," and if that party's absence threatens an existing party

8    with adverse consequences, i.e., if "the absent party is so situated that disposing of the action in

9    the person's absence may . . . leave an existing party subject to a substantial risk of incurring

10   double, multiple, or otherwise inconsistent obligations because of the interest."  Fed. R. Civ. P.

11   19(a)(1)(B)(ii).  Harrosh and the Agency do not argue they face any risks of inconsistent

12   obligations.  Neither do the Johannessens believe they face a risk of incurring inconsistent

13   obligations in California's or Nevada's absence.  The Johannessens argue instead that the *Agency*

14   might face inconsistent legal obligations "with respect to its ability to delegate project approval

15   under the Compact."  Johannessens' Suppl. Br. at 9.  They hypothesize that if this court broadly

16   permits the Agency to delegate approval decisions to hearings officers, and if California or

17   Nevada disagree with this court's interpretation of the Compact's voting provisions, then the two

18   states could seek and obtain a judicial order barring the Agency from delegating project

19   approvals.  *See id.*  But the Agency does not itself advance this theory of conflicting obligations.

20   Nor does the Johannessens' theory show the Agency faces a "substantial" risk of inconsistent

21   obligations.  Any risk it faces is attenuated.  The Johannessens' theory of conflicting obligations

22   depends on their hypotheses about future lawsuits by California and Nevada and on the

23   possibility of future conflicting decisions by other courts.

24          In any event, even if the Agency did face a "substantial" risk of inconsistent obligations—

25   or if the states were otherwise necessary by virtue of Rule 19(a)—the court would not dismiss this

26   action for that reason alone.  The court could avoid risks to the Agency, the States, and others by

27   "shaping" any relief it grants Harrosh.  *See* Fed. R. Civ. P. 19(b)(2)(B).  For reasons explained

13

1  later in this order, the court will remand the action to the Agency for further procedures rather

2  than issuing a broad injunction or declaratory judgment.

3       In sum, although the judgment in this case could have implications for other disputes,

4  other votes, and other projects, California and Nevada are not necessary parties.  Rule 19 requires

5  neither the states' joinder nor the dismissal of Harrosh's claims.

6  **III.   SUMMARY JUDGMENT**

7       **A.     Legal Standard**

8       Summary judgment is appropriate if "there is no genuine dispute as to any material fact

9  and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A dispute is

10  "genuine" if "a reasonable jury could return a verdict for the nonmoving party."  *Anderson v.*

11  *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome

12  of the suit under the governing law."  *Id.*  The parties must cite "particular parts of materials in

13  the record."  Fed. R. Civ. P. 56(c)(1).  The court then views the record in the light most favorable

14  to the nonmoving party and draws reasonable inferences in that party's favor.  *Matsushita Elec.*

15  *Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88 (1986); *Adickes v. S.H. Kress & Co.*, 398

16  U.S. 144, 157 (1970).  Cross-motions for summary judgment are evaluated separately under the

17  same standard, "giving the nonmoving party in each instance the benefit of all reasonable

18  inferences."  *Am. C.L. Union of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1097 (9th Cir. 2003).

19       The Compact gives this court authority to hear Harrosh's challenge.  For an action like

20  this one, "the scope of judicial inquiry shall extend only to whether there was prejudicial abuse of

21  discretion."  Art. VI(j)(5).  "Prejudicial abuse of discretion is established if the agency has not

22  proceeded in a manner required by law or if the act or decision of the agency was not supported

23  by substantial evidence in light of the whole record."  *Id.*

24       As summarized above, Harrosh seeks summary judgment in his favor on two claims: first,

25  he contends the board's vote to approve the Johannessens' pier was invalid because it did not

26  reflect at least five votes by members of the California delegation; second, he contends the board

27  wrongly approved the Johannessens' request to build a longer pier than would ordinarily be

28  permitted under the Agency's regulations.  The Agency and the Johannessens also seek summary

14

1    judgment on Harrosh's third claim, which relates to the pier's safety and threats to navigation.

2    The court takes these claims in turn.

3        **B.    Claim 1: The Board's Vote**

4        The court must answer three preliminary questions before it considers whether the board's

5    vote was effective: First, did Harrosh file this lawsuit before the Compact's deadline for legal

6    challenges?  Second, was he required to raise this claim with the Agency before he filed this

7    lawsuit, and if so, did he?  Third, does the equitable doctrine of unclean hands bar Harrosh from

8    obtaining any relief, even if he is right?

9            **1.    Harrosh filed this action before the deadline.**

10       The Agency and the Johannessens argue Harrosh filed this lawsuit after the Compact's

11   deadline for legal challenges.  *See* Johannessens' Mot. at 17–21; Agency Not. of Mot. at 1, ECF

12   No. 96 (joining).  The court previously considered and rejected a similar argument.  *See* Order on

13   Mot. Dismiss at 14–17.  After reviewing the administrative record, the court reaches the same

14   conclusion now: Harrosh pursued his claims before the deadline.

15       Under the Compact, any "legal action arising . . . out of the granting or denial of any

16   permit" must begin "within 60 days after the final action by the agency."  Art. VI(j)(4).  Harrosh

17   argues the "final action by the agency" in this case was the board's vote in his appeal.  If that is

18   correct, then his complaint was filed within the sixty-day period: the governing board voted on

19   August 25, 2021, AR 2471–72, and Harrosh filed this action on October 22, 2021, less than sixty

20   days later.  *See generally* Compl., ECF No. 1.  The Johannessens and the Agency contend the

21   "final action" was not the board's vote rejecting Harrosh's appeal, but rather the Agency's

22   adoption of its current regulations, summarized above, which delegate specific approval decisions

23   to hearings officers and establish a procedure for appeals to the governing board.  If that is true,

24   then Harrosh filed this action long after the sixty-day deadline.

25       The parties rely on competing lines of judicial opinions and orders interpreting the

26   Administrative Procedure Act (APA).  The APA applies to federal agencies.  The Tahoe Regional

27   Planning Agency is not a federal agency; its actions are governed by the terms of the Compact,

28   not the APA.  *Sierra Club*, 840 F.3d at 1114.  But the APA and the Compact do include some

1   similar language, including their provisions permitting challenges to "final" agency actions based

2   on a review of "the whole record." *Compare* Art. VI(j)(4)–(5) *with* 5 U.S.C. §§ 704, 706.  For

3   that reason, judicial decisions interpreting the APA can offer guidance by way of analogy,

4   although those decisions are not binding.  *See* Order on Mot. Suppl. at 2; Order on Mot. Dismiss

5   at 14.

6         In the line of APA decisions the parties debate in their cross-motions, courts had been

7   asked to decide whether the lawsuit was filed after the limitations period.  The question in those

8   cases, as in this one, was whether the "final agency action" was the adoption of a regulation or

9   policy long ago or a more recent decision.  *Compare, e.g.*, *Cal. Sea Urchin Comm'n v. Bean*, 828

10   F.3d 1046, 1049 (9th Cir. 2016) (recent action); *Shiny Rock Min. Corp. v. United States*, 906 F.2d

11   1362, 1365 (9th Cir. 1990) (longstanding regulation).  The Supreme Court recently resolved a

12   circuit split related to this line of cases.  In general, the Supreme Court held, an APA action

13   challenging a regulation must be filed within six years of the day the right of action first accrues,

14   which cannot occur until the would-be plaintiff "suffers an injury" and there has been a "final

15   agency action," among other things.  *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603

16   U.S. 799, 808 (2024) (citing 5 U.S.C. §§ 702, 704 and 28 U.S.C. S 2401(a)).  The Court reversed

17   the Eighth Circuit's contrary decision; it had held that "when plaintiffs bring a facial challenge to

18   a final agency action, the right of action accrues, and the limitations period begins to run, upon

19   publication of the regulation." *Id.* at 806 (quoting 55 F.4th 634, 641 (8th Cir. 2022)).

20         Again, Harrosh's case is not an APA case, so *Corner Post* is not controlling, but the

21   Court's reasoning is instructive nonetheless.  Although the Tahoe Regional Planning Agency

22   adopted its regulations and the appeals procedure many years before the board's vote on

23   Harrosh's appeal, his claim tests that vote in particular, not the regulation or the appeals

24   procedure writ large.  Harrosh would have had no reason to contest the board's decision, let alone

25   to challenge its authority or vote, if the board eventually accepted his appeal and overturned the

26   hearings officer's decision; nor could Harrosh have pursued the claim he now advances if at least

27   five members of the California delegation later cast their votes against him.  Courts assume

28   legislatures do not intend for the limitations periods they create to begin running until after the

1    plaintiff "has a complete and present cause of action."  *Id.* at 811 (quoting *Graham County Soil &*

2    *Water Conservation Dist. v. United States ex rel. Wilson*, 545 U.S. 409, 418 (2005)).  "Unless

3    Congress has told us otherwise in the legislation at issue," the Court wrote in *Corner Post*, "a

4    cause of action does not become 'complete and present' for limitations purposes until the plaintiff

5    can file suit and obtain relief."  *Id.* (quoting *Bay Area Laundry & Dry Cleaning Pens. Tr. Fund v.*

6    *Ferbar Corp. of Cal.*, 522 U.S. 192, 201 (1997)).  In this case, nothing in the administrative

7    record suggests Harrosh could have filed his complaint in this action before the challenged vote,

8    so analogizing to the APA would mean the limitations period did not start running in this case

9    until that vote.

10        The administrative record supports this reasoning.  Harrosh's arguments are specific to the

11   Johannessens' pier and its effects on him and his property.  He opposed their application before

12   the hearings officer.  He focused on the pier and its features.  After the hearings officer's

13   decision, he reiterated his arguments about the pier but also questioned whether the board could

14   uphold the hearings officer's decision without taking a specific vote.  And after the board's

15   decision, he has contended in this court that the board's vote did not satisfy the Compact's

16   requirements.  *See, e.g.*, AR 2471 (questioning why a supermajority was necessary to overturn the

17   hearings officer's decision "when it's supposed to be a supermajority to approve it"); AR 1867–

18   68 (focusing on the specifics of the Johannessens' proposed pier).

19        The court thus disagrees with the Johannessens' and the Agency's interpretation of the

20   APA case law.  *See* Johannessens' Mot. at 18–19.  The holdings in those cases probably cannot

21   be reconciled with the Supreme Court's intervening decision in *Corner Post*.  *Compare, e.g.*,

22   *Wind River*, 946 F.2d at 715 ("[I]f the person wishes to bring a policy-based facial challenge to

23   the government's decision, that too must be brought within six years of the decision."), *with, e.g.*,

24   *Corner Post*, 603 U.S. at 825 ("An APA claim does not accrue for purposes of § 2401(a)'s 6-year

25   statute of limitations until the plaintiff is injured by final agency action.").  But because this is not

26   an APA case, the court need not and does not decide whether that is so.  Suffice it to say *Corner*

27   *Post* is recent and persuasive and supports Harrosh's position.  But in any event, the Johannessens

28   rely on an untenable argument about differences between the language in the Compact and the

1  language in the statute that defines the limitations periods for APA claims.  *See* Johannessens'

2  Mot. at 17–18 (quoting Act VI(j)(4)).  Contrary to the Johannessens' argument, the statute that

3  creates the limitations period for APA claims uses broader terms than the Compact, not narrower.

4  *Compare* 28 U.S.C. § 2401 (setting the catchall limitations period for "every civil action

5  commenced against the United States") *with* Art. VI(j)(4) (setting the limitations period for only

6  those actions "arising out of" specifically listed Agency actions or decisions).

7        For these reasons, the board's vote on Harrosh's appeal was the "final action" for

8  purposes of Article VI(j)(4) of the Compact.  This lawsuit was filed by the sixty-day deadline, so

9  it is timely.

10              **2.        Harrosh pursued his claim before the Agency.**

11        The Johannessens and the Agency contend Harrosh should not be permitted to pursue his

12  claims about the governing board's vote because he did not first raise these claims with the

13  governing board or a hearings officer.  *See* Johannessens' Mot. at 21–24.  The court held

14  otherwise in its previous order, reviewing then only the allegations in Harrosh's complaint.  *See*

15  Order on Mot. Dismiss at 7–14.  The court reaches the same conclusion now after reviewing the

16  whole administrative record.

17        "Administrative review schemes commonly require parties to give the agency an

18  opportunity to address an issue before seeking judicial review of that question.  The source of this

19  requirement (known as issue exhaustion) varies by agency.  Typically, issue-exhaustion rules are

20  creatures of statute or regulation." *Carr v. Saul*, 593 U.S. 83, 88 (2021) (footnote omitted).  In

21  this case, the Compact does not include an exhaustion rule, but the Agency has adopted an

22  exhaustion rule in its regulations.  Under those regulations, any appeal from a hearings officer's

23  decision must include a "written statement of appeal." Rules § 11.2.  "The written statement of

24  appeal shall include the name and address of the appellant and a detailed and specific explanation

25  of the ground for the appeal." *Id.* § 11.4.  "Arguments and bases for appeals that are not included

26  in the statement of appeal or staff's position paper shall neither be raised nor considered by the

27  Board." *Id.*

1    Harrosh submitted a statement of appeal when he challenged the hearings officer's

2    decision.  In that statement, he did not challenge the voting procedure.  But the Agency's

3    regulations did not require him to raise that claim.  As noted above and in the court's previous

4    order, the regulations require only that the statement of appeal include "a detailed and specific

5    explanation of the ground for the appeal."  Rules of Procedure § 11.4; *see also* Order on Mot.

6    Dismiss at 11.  The challenge he omitted from his statement of appeal—that the Board's vote was

7    invalid under the Compact—was not a challenge to the hearings officer's decision.  The omitted

8    challenge targeted the board's vote.  Order on Mot. Dismiss at 11.  Harrosh could not challenge

9    the vote before that vote occurred.

10    As the Johannessens point out, and as the court recognized in its previous order, Harrosh's

11    first claim is in some ways equivalent to a broader attack on the hearings officer's authority and

12    the Agency's regulations.  *See* Johannessens' Mot. at 21–24; Order on Mot. Dismiss at 12.

13    Harrosh could potentially have raised a broader attack about delegation and the Compact's

14    language before the vote itself.  But the court does not read the Agency's regulations as requiring

15    appellants like Harrosh to include such broad challenges in their statements of appeal.  *See*

16    Johannessens' Mot. at 21–24.  As explained in the previous subsection, at the time Harrosh was

17    preparing his appeal, the only way he could plausibly claim to have suffered harm from the vote

18    is if the board eventually rejected his challenge in a majority vote that did not include at least five

19    votes from the California delegation.  His claim was at best theoretical before the board vote.  No

20    matter how Harrosh's claim about that vote is framed, its viability depends on the vote, not the

21    hearings officer's decision.

22    The court also declines to grant judgment to the Agency and the Johannessens based on a

23    common-law exhaustion rule.  Federal courts have imposed a common-law rule of issue

24    exhaustion based on "an analogy to the rule that appellate courts will not consider arguments not

25    raised before trial courts."  *Carr*, 593 U.S. at 88 (quoting *Sims v. Apfel*, 530 U.S. 103, 108–09

26    (2000)).  The viability of that analogy depends on the assumption that the agency adjudicator

27    could have heard and resolved the challenge that the federal court plaintiff did not raise.  *See id.*

28    at 93.  "It makes little sense to require litigants to present claims to adjudicators who are

19

1  powerless to grant the relief requested." *Id.* In Harrosh's case, the administrative record does not

2  show the hearings officer or even the governing board had the power to offer Harrosh the relief he

3  seeks. Nothing shows, for example, that the hearings officer or the board had the power to

4  change the Agency's policy or regulations or to make a one-time exception for Harrosh's appeal.

5  Courts also hesitate to demand the exhaustion of structural or legal challenges. *See id.*

6  at 92. These types of challenges "usually fall outside the adjudicators' areas of technical

7  expertise." *Id.* Harrosh's claim is structural and legal in the sense that his arguments draw on the

8  structure of the Compact, the agency's power under the Compact and legal reasoning about its

9  terms. The administrative record does not show the hearings officer or board had any particular

10  expertise to offer in response to legal arguments about the Compact's terms, the finality of a

11  hearings officer's decision or the niceties of Compact interpretation. Rather, as this court wrote

12  in its previous order, "[t]he judiciary is the final authority on issues of statutory construction."

13  Order on Mot. Dismiss at 13 (quoting *Chevron v. Nat. Res. Def. Council*, 467 U.S. 837, 843 n.9

14  (1984), *overruled on other grounds by Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024)).

15  In any event, even if common law rules of exhaustion required Harrosh to raise this issue

16  with the Agency before he filed this case, the result would be the same: Harrosh raised the voting

17  rules in the hearing before the governing board even though he did not include an argument about

18  those rules in his statement of appeal. *See* AR 2471. The court cannot conclude on this record

19  that Harrosh fell short of any requirement to exhaust the issue he now presses in his first claim.

20  **3.       Harrosh's claim is not barred by the doctrine of unclean hands.**

21  The Johannessens contend Harrosh is entitled to no relief because he has acted with

22  "unclean hands." *See* Johannessens' Opp'n at 9–10; Johannessens' Reply at 4–6. None of the

23  relevant facts is disputed. As noted above, Harrosh is one owner of the property to the south of

24  the Johannessens' lot. First Am. Compl. ¶ 5; Agency Answer ¶ 5; Johannessens' Answer ¶ 5.

25  Samuel and Suzanne Harrosh also have interests in the same property, and Harrosh claimed he

26  was representing their interests before the Agency. *See* RJN Ex. 1, ECF No. 100-1; AR 1853,

27  1877. The Harrosh property owners applied for and received permission to remove trees from the

28  property, relying on the same delegation of approval authority Michael Harrosh now challenges.

1    *See* Req. J. Not. Exs. 1–2, ECF Nos. 100-1, 100-2.  The Harrosh property owners also applied for

2    and received permission to moor watercraft on their property, relying on the project approval

3    process just as the Johannessens now do.  *See id.* Ex. 9, ECF No. 100-9; *see also* Code §§ 82.7.3,

4    84.3 (governing mooring buoys and waterfront structures such as boat slips, boat houses, and boat

5    lifts).  The Johannessens argue Harrosh cannot now be heard to protest that the board's vote fell

6    short of the Compact's requirements when, in the past, he and members of his family have

7    benefitted from the same approval process.

8          It is unclear what legal standards govern this dispute.  The Johannessens and Harrosh cite

9    decisions by both federal and California courts without discussing whether federal or state law is

10   controlling.  *See Johannessens' Opp'n* at 10 (citing federal law); *Harrosh Reply* at 12 (same);

11   *Johannessens' Reply* at 5–6 (citing both California and federal law).  Having reviewed those

12   cases and others, the court finds no relevant distinction between the relevant rules developed in

13   federal and California courts.  The result would be the same no matter whether the court applied

14   only federal or California law.

15         The defense of unclean hands "is often invoked but rarely applicable."  *Ests. of Collins &*

16   *Flowers*, 205 Cal. App. 4th 1238, 1241 (2012).  It is a "disparate" and "vague" collection of

17   "separate defenses" with "rather weak unifying qualities."  *Blain v. Doctor's Co.*, 222 Cal. App.

18   3d 1048, 1059 (1990) (quoting Zechariah Chafee, Jr., *Coming into Equity with Clean Hands*, 47

19   Mich. L. Rev. 877, 1091–92 (1949)).  In general terms, it "bars relief to a plaintiff who has

20   violated conscience, good faith or other equitable principles in his prior conduct, as well as to a

21   plaintiff who has dirtied his hands in acquiring the right presently asserted."  *Dollar Sys., Inc. v.*

22   *Avcar Leasing Sys., Inc.*, 890 F.2d 165, 173 (9th Cir. 1989) (applying California law); *see also,*

23   *e.g.*, *Inst. of Cetacean Rsch. v. Sea Shepherd Conservation Soc.*, 725 F.3d 940, 947 (9th Cir.

24   2013) (summarizing and applying federal law).  The plaintiff's alleged misconduct must "relate

25   directly" to the parties' current dispute.  *Dollar Sys.*, 890 F.2d at 173 (quoting *Arthur v. Davis*,

26   126 Cal. App. 3d 684, 693–94 (1981)).  "[W]ether there is a bar depends upon the analogous

27   case law, the nature of the misconduct, and the relationship of the misconduct to the claimed

28   injuries."  *Blain*, 222 Cal. App. 3d at 1060.

21

1    The Johannessens have not demonstrated Harrosh has acted with "unclean hands" as

2    would be necessary to bar his action here. The members of the Harrosh family who have taken

3    advantage of the Agency's project approval process in the past are not in the wrong for having

4    done so. Nor has Harrosh committed some misconduct for asserting his claims in this case. The

5    Johannessens have not proven, for example, that Harrosh's allegations or legal claims are false or

6    fraudulent. *Cf., e.g.*, *Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806,

7    816, 819 (1945) (holding patent claims were barred by unclean hands defense because claimant

8    "acted affirmatively to magnify and increase" the effects of a previous perjury in pursuing its

9    claims).

10    There is some irony in the fact that Harrosh and his family have previously benefitted

11    from the administrative process they now question. Unfair contradictions between a person's

12    legal theories at differing times for differing purposes might lead a court to bar that person from

13    successfully relying on both theories, for example under the rule of judicial estoppel. *See, e.g.*,

14    *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). But the Johannessens do not assert an

15    estoppel defense, and when it comes to unclean hands, courts have consistently required proof of

16    some action by the plaintiff that is inequitable in its own right. *See, e.g.*, *Precision Instrument*,

17    324 U.S. at 816; *Dollar Sys.*, 890 F.2d at 173. There must be "misconduct." *See Inst. Cetacean*

18    *Rsch.*, 725 F.3d at 947; *Blain*, 222 Cal. App. 3d at 1059–60. In *Merry v. Garibaldi*, for example,

19    which the Johannessens cite, *see* Johannessens' Reply at 6, the plaintiff was barred from

20    obtaining equitable relief because she had "agreed to conceal the commission of the felony," i.e.,

21    a forgery by her son-in-law. *See* 48 Cal. App. 2d 397, 398–99, 403 (1941); *see also*, *e.g.*,

22    *Peregrine Funding v. Sheppard Mullin Richter & Hampton LLP*, 133 Cal. App. 4th 658, 679

23    (2005) (trustee could not assert a bankrupt corporation's claims that arose from that corporation's

24    ponzi scheme).

25    The Ninth Circuit's decision in *Institute of Cetacean Research*, 725 F.3d 940, is a more

26    persuasive analogue for this case. The plaintiffs in that case were hunting whales with a permit

27    issued by the Japanese government, but they had refused to comply with an injunction issued by

28    an Australian authority. *See id.* at 943. The defendant was a conservation society that had used a

22

1   variety of tactics to harass and damage whaling vessels, which led to the researchers' lawsuit.

2   *See id.* at 942–43.  The Ninth Circuit rejected the conservation society's unclean hands defense

3   because the whalers were guilty of no wrong.  *See id.* at 947.  They had rights to navigate safely

4   and to protection from attacks, and although they had refused to comply with the Australian

5   injunction, neither the United States nor Japan recognized Australia's authority to issue that

6   injunction.  *See id.*  Just as the whale-hunting researchers were entitled to navigate the oceans

7   without fear of attacks from marauding conservationists, Harrosh did no wrong in pursuing the

8   Agency's process.  He is also entitled to assert claims under the Compact.

9       For these reasons, the court finds the Johannessens and the Agency cannot assert a

10  successful defense based on the equitable doctrine of unclean hands.

11          **4.      The governing board's vote was not effective to approve the**
12                  **Johannessens' pier project.**

13      With these preliminary questions answered, the court turns to Harrosh's claim and the

14  Compact's voting provisions.  Several rules govern this court's interpretation of the disputed

15  Compact terms.  The first follows from the nature of all interstate compacts.  The Constitution

16  authorizes states to enter compacts with one another if Congress approves the compact.  *See* U.S.

17  Const. Art. I, § 10, cl. 3.  For that reason, approved interstate compacts are both federal statutes

18  and contracts between or among states.  *Oklahoma v. New Mexico*, 501 U.S. 221, 235 n.5 (1991).

19  Federal courts interpret them "under the principles of contract law."  *Tarrant Reg'l Water Dist. v.*

20  *Herrmann*, 569 U.S. 614, 628 (2013).  "[T]he express terms of the Compact" are the starting

21  point in a compact's interpretation, as those terms are "the best indication of the intent of the

22  parties."  *New York v. New Jersey*, 598 U.S. 218, 223 (2023) (quoting *Tarrant*, 569 U.S. at 628).

23      Compacts, like contracts, can be ambiguous.  They may be silent on some crucial issue.

24  *See, e.g.*, *New York*, 598 U.S. at 223–24; *Tarrant*, 569 U.S. at 629–31.  A particular word or

25  phrase might be interpreted in two different ways, and both interpretations might be reasonable.

26  *See, e.g.*, *Alabama v. North Carolina*, 560 U.S. 330, 345–46 (2010).  Or an interpretation that

27  seems correct in isolation might lead to unexpected or absurd results.  *See Oklahoma*, 501 U.S. at

28  232–33.  Ambiguities can be resolved with the help of several "interpretive tools," *Tarrant*, 569

1    U.S. at 631, and "background principles of law," *New York*, 598 U.S. at 224, such as "that a State

2    does not easily cede its sovereignty," *Tarrant*, 569 U.S. at 631. A court also can consider the

3    parties' "conduct under the Compact," *id.* at 636, that is, their "course of performance," *Alabama*,

4    560 U.S. at 346, as well as the parties' discussions and expectations at the time the compact was

5    negotiated or approved, *see New York*, 598 U.S. at 225; *Oklahoma*, 501 U.S. at 234 n.5.

6         This court found the Compact was unambiguous in its previous order and reaches the

7    same conclusion again now. Harrosh and the Agency agree the Johannessens' pier was a

8    "project" under the terms of the Compact. *See* Art. II(h); First Am. Compl. ¶ 33; Agency Answer

9    ¶ 33. The Johannessens do not argue otherwise. *See, e.g.*, Johannessens' Opp'n at 6. When the

10   Agency "is required to review or approve any project, public or private," it must "take final action

11   by vote, whether to approve, to require modification or to reject such project," and it must do so

12   "within 180 days after the application for such project is accepted as complete by the agency."

13   Art. III(g). If it does not vote before the 180-day deadline, then the applicant can "bring an action

14   in a court of competent jurisdiction to compel a vote." *Id.* The Compact also defines the voting

15   procedures the board must follow when it approves a project: "For approving a project, the

16   affirmative vote of at least five members from the State in which the project is located and the

17   affirmative vote of at least nine members of the governing body are required." Art. III(g)(2). This

18   language is unambiguous: the Agency must approve projects by vote, it must do so within 180

19   days, and the vote must comply with the five-and-nine majority rule of Article III(g)(2).

20        The Agency argues the Compact did not bar the governing board from delegating the

21   decision on the Johannessens' pier to the Agency's staff. *See, e.g.*, Agency Mot. at 12–13. In the

22   Agency's reading, the voting requirements in Article III(g)(2) kick in only if the governing board

23   decides to take up an application—i.e., only for projects the board believes are "most warranting"

24   of its attention. *Id.*; *see also* Agency Reply at 1. That interpretation is not reasonable. It

25   contradicts Article III(g) directly, which requires the Agency to take "final action" on project

26   approvals "by vote" and defines the voting procedure as a vote by the governing board. The

27   agency's interpretation would make that voting procedure superfluous. If the Compact allows the

28   board to delegate approvals as it deems fit, then projects could be approved without any vote at

24

1    all.  For similar reasons, Article VI(b) of the Compact does not excuse the Johannessens' pier

2    from approval just because it requires approval from "the agency" rather than "the governing

3    board."  *See* Order on Mot. Dismiss at 19–20.  "If the Agency could assign a staff member to

4    approve any projects it liked, then it could bypass the voting procedure in Article III entirely."  *Id.*

5            In this respect, the Agency's argument now is similar to another argument it made in a

6    similar case many years ago.  The dispute in that case revolved around Article VI(g) of the same

7    interstate Compact.  *See Van De Kamp*, 766 F.2d at 1313–14.  Article V(g) requires the Agency

8    to "adopt ordinances prescribing specific written findings that the agency must make prior to

9    approving any project in the region."  Art. V(g).  It also explains what findings satisfy the

10   requirement: the findings must "relate to environmental protection," and they must "insure that

11   the project under review will not adversely affect implementation of the regional plan and will not

12   cause the adopted environmental threshold carrying capacities of the region to be exceeded."  *Id.*

13           In *Van de Kamp*, the Agency urged the Ninth Circuit to read this language as a "general

14   directive" granting the Agency "discretion" to determine whether to make findings from one

15   project to the next.  *See* 766 F.2d. at 1314.  Both the district court and court of appeals disagreed.

16   They interpreted Article V(g) as providing unambiguously that the Agency could not approve any

17   project "without written findings to show the project would not cause the adopted environmental

18   threshold carrying capacities of the region to be exceeded."  *Id.* (quotation marks omitted).  The

19   Agency's interpretation would render that part of Article VI(g) "meaningless."  *Id.*  The Agency's

20   interpretation also conflicted with the Compact's overall purposes and motivations, i.e., providing

21   opportunities for growth without exceeding environmental standards.  *See id.*

22           The same is true of the Agency's interpretation of the Compact's voting provisions in this

23   case.  If the governing board had discretion to choose which projects it would approve by vote

24   and which it would not, then the Compact's precise and stringent double-supermajority voting

25   procedure would serve little purpose.  The Agency's interpretation also conflicts with the

26   Compact's broader purpose of balancing growth with the potential environmental harms.  The

27   Agency's interpretation would create a more permissive and more streamlined project approval

28   process, potentially upsetting the balance between growth and environmental protection.

1    The Agency relies heavily on evidence about the practical consequences of interpreting

2 the Compact as requiring a board vote for every project.  *See, e.g.*, Agency Mot. at 13–15.  The

3 Agency also cites California's, Nevada's, Congress's and other courts' alleged acquiescence in

4 the board's current practices.  *See, e.g., id.* at 17–21.  It is unclear whether the court may even

5 consider this evidence, as the Agency offers it in support of an interpretation that is at odds with

6 the Compact's unambiguous terms.  The parties have cited no controlling cases, and the court has

7 found none.  The overwhelming weight of persuasive authority suggests, however, that the

8 Agency's position is incorrect.  Although the Supreme Court appears not to have answered the

9 question directly, it has repeatedly weighed extrinsic evidence only when interpreting ambiguous

10 compacts.  *See, e.g., New York*, 598 U.S. at 923–24; *Tarrant*, 569 U.S. at 630–31; *Alabama*, 560

11 U.S. at 341; *Oklahoma*, 501 U.S. at 233–36 & n.5.  And although the Ninth Circuit appears not to

12 have decided expressly whether courts can consider extrinsic evidence when interpreting

13 unambiguous interstate compacts, other federal courts of appeals have refused to consider

14 extrinsic evidence when interpreting facially unambiguous interstate compacts.  *See, e.g., State of*

15 *Neb. v. Cent. Interstate Low-Level Radioactive Waste Compact Comm'n*, 187 F.3d 982, 987 (8th

16 Cir. 1999); *Del. River Joint Toll Bridge Comm'n v. Oleksiak*, 612 F. Supp. 3d 428, 451 (E.D. Pa.

17 2020), *aff'd*, 985 F.3d 189, 195–96 (3d Cir. 2021).  Analogously, the Ninth Circuit has refused to

18 consider extrinsic evidence when interpreting facially unambiguous tribal-state compacts.  *See*

19 *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 561–62 (9th Cir. 2016); *Idaho v. Coeur*

20 *d'Alene Tribe*, 794 F.3d 1039, 1045 & n.9 (9th Cir. 2015).

21    The Agency cites *F.S. Smithers & Co. v. Federal Insurance Co.  See* Agency Mot. at 12

22 n.6 (citing 631 F.2d 1364, 1366 (9th Cir. 1980)).  *Smithers* was not about a compact.  It was an

23 insurance dispute, and the circuit was applying California contract law, not the federal law for

24 interpreting interstate compacts.  California law on the admissibility of extrinsic evidence can be

25 complex and difficult to apply, as this court explained in another case.  *Lennar Mare Island, LLC*

26 *v. Steadfast Ins. Co.*, 176 F. Supp. 3d 949, 962–74 (E.D. Cal. 2016).  But even California law

27 prohibits the use of extrinsic evidence when it flatly contradicts an unambiguous contract.  *See id.*

26

1    at 966–67.  Given the weight of the persuasive authority cited above, the court declines to

2    consider extrinsic evidence that contradicts the Compact's unambiguous requirements.

3          In the interests of completeness and certainty, however, the court has reviewed the

4    Agency's extrinsic evidence.  It does not support the Agency's position.  First, to be sure, there is

5    no dispute that the Agency receives and must process thousands of project applications of varying

6    complexity and scope.  *See* Agency Mot. at 14.  But the Agency has not demonstrated its

7    regulations cannot be modified to ensure no project is approved without a five-and-nine vote.  For

8    example, it cites no Compact provision that would prevent the governing board from adopting an

9    abbreviated or streamlined review procedure, such as placement of items on a consent calendar,

10    for simple projects in specific categories, from formally adopting the recommendations of staff

11    members that generate no objections, or from increasing the frequency of board meetings.  Nor

12    does the Agency support its claim that many projects "would become impossible to accomplish

13    due to the passage of time before a noticed Governing Board meeting could occur."  *Id.*  It cites

14    only a compact provision requiring "at least monthly" meetings and a quarterly report showing

15    how many applications the Agency received by quarter in a recent year.  *See id.* (citing Art. III(d)

16    and Req. J. Not. Ex. 7 at 0011, ECF No. 96-8).  The court is not suggesting in this order that the

17    Agency must modify its regulations or voting procedure.  The court observes only that the

18    administrative record in this particular case does not show the practical consequences of the

19    Compact's unambiguous language are so absurd or so extreme that the Compact cannot possibly

20    mean what it clearly states.  Nothing precludes the Agency from arguing or proving in another

21    case that the practical implications of Harrosh's position justify a different interpretation.

22          Second, the Agency argues no one other than Harrosh—not Congress, not California, not

23    Nevada, and not the many courts who have reviewed the agency's decisions—has ever expressed

24    any doubts that the governing board can approve some projects without a five-and-nine vote.  *See*

25    Agency Mot. at 17–21.  But California and Nevada appear not to agree with the Agency.  As

26    noted above, they suggest the board's vote might not actually have complied with the Compact.

27    *See* Cal. Suppl. Br. at 4 & n.2; *see also* Nev. Suppl. Br. (joining).  And in any event, the absence

28    of any protest or attention is unlikely to be the result of any person's agreement with the

1    Agency's actions.  The silence is instead most likely the consequence of Harrosh's unique

2    position as a third party pursuing an appeal of an approval decision.  Appeals of approval

3    decisions—as opposed to denials—have been exceedingly rare, *see* Agency Mot. at 17, and not

4    everyone can afford the time and attention necessary to pursue litigation contesting an approval

5    decision in court.  None of the decisions cited in the Agency's briefs reflect any court's actually

6    considering a claim like the one Harrosh now raises.  *See id.* at 19–20.  For these reasons, the

7    court cannot conclude California or Nevada agrees with or has acquiesced in the Agency's

8    actions and interpretation.

9        The Agency's arguments about extrinsic evidence also give short shrift to the history

10   behind the current Compact's rules for approving projects.  As summarized above, the Compact's

11   original voting rules permitted a minority from one state delegation to effectively override an

12   overall board majority vote against a particular project.  *See Younger*, 516 F.2d at 216–20.

13   California's frustrations with these rules contributed to its temporary withdrawal from the

14   Compact and, later, were one subject of the 1980 amendments.  The Compact's current project-

15   approval voting rules ensure that no project can be approved without at least five affirmative

16   votes from within the relevant state's delegation.  If the court were to interpret those voting rules

17   as the Agency proposes, then some projects could go forward without ever securing that support

18   within the relevant state's delegation.

19       In addition to the Agency's arguments about ambiguity and extrinsic evidence, it contends

20   the court must defer to the Agency's interpretation of the Compact—even if the court disagrees

21   with those interpretations—under the *Chevron* doctrine.  *See, e.g.*, Agency Mot. at 15–16.  There

22   are two problems with this position.  First, the Supreme Court has now overruled *Chevron*.  *See*

23   *Loper Bright*, 603 U.S. at 412.  Second, as this court noted in its previous order, state agencies'

24   interpretations of federal law are not entitled to deference even under the overruled *Chevron*

25   doctrine.  Order on Mot. Dismiss at 17 n.8.  Federal courts owe no *Chevron*-style deference to the

26   various agencies and commissions created by interstate compacts unless the applicable compact

27   grants the agency interpretive authority.  *See Alabama*, 560 U.S. at 344.  The Compact does not

28

1    grant the Agency that type of deference.  Instead, it allows a reviewing court to decide for itself

2    whether the Agency "proceeded in a manner required by law."  Art. VI(j)(5).

3          In sum, then, the governing board's vote to reject Harrosh's appeal was not effective to

4    approve the Johannessens' pier under Article III(g)(2) because it did not include "the affirmative

5    vote of at least five members from the State in which the project is located."

6          Ordinarily it is unnecessary for a court to explain in detail what it has not decided.  But

7    given California's and Nevada's decision not to participate as parties in this case, and given the

8    Agency's concerns about the practical consequences of the court's decision for other projects, the

9    court clarifies that several questions remain unanswered, including:

10         • Whether the Agency's regulations otherwise comply with the Compact's voting

11            rules;

12         • Whether, how, and when the Agency may delegate authority to staff members;

13         • Whether the governing board must hear and vote on project applications in the

14            first instance;

15         • Whether the governing board can affirm a hearings officer's rejection decision

16            with a vote that includes fewer than five affirmative votes from the relevant state

17            delegation; and

18         • Whether a hearings officer's decision to approve a project is invalid if no one

19            objects, no one files an administrative appeal, and no one pursues an action in a

20            court of competent jurisdiction.

21    This is not an exhaustive list.  It is illustrative only.  The court concludes only that the governing

22    board's vote to reject Harrosh's appeal was not effective to approve the Johannessens' pier under

23    Article III(g)(2) in this case.

24              **5.      Remand is the appropriate remedy.**

25         "[A] reviewing court is not generally empowered to conduct a de novo inquiry into the

26    matter being reviewed and to reach its own conclusions based on such an inquiry."  *Fla. Power &*

27    *Light Co. v. Lorion*, 470 U.S. 729, 744 (1985).  When a reviewing court concludes an agency has

28    erred, it should ordinarily remand the case to the agency.  *See I.N.S. v. Orlando Ventura*, 537 U.S.

1  12, 16 (2002) (per curiam).  That is the appropriate remedy in this case.  The board members who

2  voted unanimously rejected Harrosh's appeal, but did so in a vote that was not effective to

3  approve the Johannessens' pier project under Article III(g)(2).  The governing board should be

4  permitted to schedule a vote "at a time when five California members are available to participate

5  in the vote," as the Agency persuasively contends and as California and Nevada suggest.  Agency

6  Reply at 9; Cal. Br. at 4 n.2; Nev. Br. at 1 (joining California).

7       Harrosh urges the court to hold instead that the board's vote amounted to an irrevocable

8  rejection of the Johannessens' application.  *See* Harrosh Mot. at 15–18.  But his argument

9  depends on an unpersuasive interpretation of the Compact's terms.  Under Article III(g)(2), "[i]f

10  at least five members of the governing body from the State in which the project is located and at

11  least nine members of the entire governing body do not vote in favor of the project, upon a

12  motion for approval, an action of rejection shall be deemed to have been taken."  The most

13  reasonable interpretation of this language is not that eleven board members' unanimous vote to

14  approve the Johannessens' pier was actually a vote to reject it, as Harrosh contends.  The better

15  reading is the Agency's: if the governing board is considering a motion to approve a particular

16  project, and if the resulting vote falls short of the five-and-nine majority, then "an action of

17  rejection shall be deemed to have been taken."  Art. III(g)(2).  There was no "motion for

18  approval" in this case.  *See* Agency Mot. at 25.  The board thought it was considering only

19  whether to hear Harrosh's appeal.  *See* AR 2472.  It voted "no."  *Id.*  The vote was as ineffective

20  to reject the proposed project as it was to approve it.

21       Harrosh also argues a remand would violate the Compact, citing the Ninth Circuit's

22  decision in *People of State of California ex rel. Younger v. Tahoe Regional Planning Agency*,

23  516 F.2d 215, one of the 1970s cases discussed in the background section above.  *See supra*

24  section I at 2–4 & n.1.  The Ninth Circuit did not hold in *Younger* that a court cannot remand an

25  action to the Agency.  It did not even consider whether that remedy—or any remedy—was

26  available, and for good reason: California, the plaintiff and challenger in that case, did not prevail,

27  so there would be no remedy.  The circuit also was interpreting the original compact's voting

30

1    provisions, not the amended voting provisions of Article III(g)(2).  This court has reviewed the

2    modern Compact carefully and has found no provisions barring a remand.

3        **C.        Claim 2: The Pier's Length**

4        In Harrosh's second claim, he alleges the Johannessens' pier is longer than what is

5    allowed by the Agency's regulations.  The parties agree the pier's additional length complies with

6    the relevant regulations if that "additional length is necessary for the functionality of the pier."

7    Code § 84.4.3(B)(2)(b); *see also* First Am. Compl. ¶ 123; Agency Mot. at 21; Johannessens' Mot.

8    at 24–27.

9        Harrosh portrays his second claim as an argument that the Agency did not proceed "in a

10   manner required by law" under Article VI(j)(5).  *See* Harrosh Reply at 17 & n.10.  He cites no

11   law requiring any specific finding or process.  He instead relies on the Agency's regulations, and

12   he contends the record does not include evidence supporting the Agency's conclusion that the

13   additional length was "necessary for the functionality of the pier."  *See id.* (citing Code

14   § 84.4.3(B)(2)(b))..  The court therefore agrees with the Agency that the court must uphold the

15   Agency's conclusion unless that conclusion "was not supported by substantial evidence in light of

16   the whole record."  Art. VI(j)(5).  *See* Agency Mot. at 24.

17       The administrative record supports the Agency's finding that the additional length was

18   necessary for the functionality of the pier.  A consultant found "[t]he additional length provides

19   for approximately two-feet of additional draft that is imperative to clear boulders in low water

20   conditions for safe navigation."  AR 293.  In the Johannessens' presentations to the hearings

21   officer and governing board, they claimed similarly that "[t]he additional length is necessary for

22   safe navigation at periods of low water."  AR 1774; *see also* AR 1962 ("Due to the rocky

23   substrate of Flick Point and adverse navigation conditions at periods of low water, the additional

24   length is necessary for the functionality of the pier.").  The Agency's staff found the additional

25   length was "commensurate with the adjoining piers" and would "improve the functionality of the

26   pier due to the rocky substrate of Flick Point and adverse navigation conditions at periods of low

27   water."  AR 1358; *see also* AR 1353 ("The additional length is being requested to improve the

28   functionality of the pier due to the rocky substrate of Flick Point and adverse navigation

31

conditions at periods of low water.").  Elsewhere the Agency's staff wrote the "[a]dditional length is needed for pier functionality" and found the length "[i]n conformance" with the Agency's Shorezone Code.  AR 1367.

Harrosh argues the record shows at most that the extra length was an "improvement" in the pier's functionality, not "necessary" for its functionality.  *See, e.g.*, Harrosh Reply at 16–19.  The Agency and the Johannessens have cited evidence in the record before the Agency showing the pier would be dangerous for boats and people in low-water conditions without the additional length.  *See, e.g.*, AR 293; *see also* Johannessens' Mot. at 26–27 (citing administrative record).  This evidence strongly supports the finding that the additional length was necessary for the pier's functionality.  The similar length of the piers on the adjacent plots, including on Harrosh's property, supports this same conclusion.  *See* AR 1358; Johannessens' Mot. at 27 (citing administrative record).

For these reasons, the Agency's and the Johannessens' motions are granted on Harrosh's second claim, and his motion is denied to that extent.

### D.    Claim 3: Navigation and Public Safety

Harrosh alleges the record does not show whether the Johannessens' pier would adversely impact navigation or create a threat to public safety.  *See* First Am. Compl. ¶¶ 138–51.  He does not seek summary judgment of this claim, and he does not oppose defendants' request for summary judgment of this claim.  The record includes a letter from the United States Army Corps of Engineers, which supports a finding of no adverse impacts on navigation or threats to public safety.  *See* Army Corps of Eng'rs Letter (June 30, 2022), Req. J. Not. Ex. 3, ECF No. 36-1.  The court thus grants the defendants' motions for summary judgment of Harrosh's third claim.

## IV.    CONCLUSION

For the reasons above, the court orders and declares as follows:

- The motion for an extension of time (ECF No. 110) is granted nunc pro tunc to the time of the motion's filing.

- Harrosh's motion for summary judgment (ECF No. 95) is granted in part as to claim one and is otherwise denied.  The governing board's August 25, 2021 vote

1  was ineffective to approve the Johannessens' project.  Because the court has

2  granted Harrosh's motion for summary judgment in this respect, his motion for

3  judgment on the pleadings (ECF No. 60) is denied as moot.

4  • The Agency's motion (ECF No. 96) is granted in part as to claims two and three

5  and is otherwise denied.

6  • The Johannessens' motion (ECF No. 98) is granted in part and denied in part to the

7  same extent as the Agency's motion.

8  • This matter is remanded to the Agency for further proceedings consistent with this

9  order.

10  • The Clerk's Office is directed to close this case.

11  IT IS SO ORDERED.

12  DATED:  April 15, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE